200 P.3d 764 (2009)
Kevin DUMONT, Appellant,
v.
CITY OF SEATTLE, Respondent.
No. 61701-0-I.
Court of Appeals of Washington, Division 1.
February 17, 2009.
*765 Andrew James Kinstler, Helsell Fetterman LLP, Seattle, WA, for Appellant.
Frederick E. Wollett, Seattle City Attorney's Office, Jennifer Schubert, City Hall, Seattle, WA, for Respondent.
DWYER, Acting C.J.
¶ 1 Kevin Dumont, a white City of Seattle firefighter, appeals from the summary judgment dismissal of his lawsuit alleging that the City of Seattle fire chief violated RCW 49.60.400 by not promoting him to the job of fireboat engineer while, instead, promoting a less-qualified African-American applicant to the position. The sole contested issue on appeal is whether Dumont met his burden of showing that material issues of fact exist as to whether the fire chief's stated basis for the promotion was pretextual. Viewing the evidence in the light most favorable to Dumont, we conclude that he met his burden. Accordingly, we reverse.

I
¶ 2 Gary Morris was fire chief from July 2001 until April 2004. There is no dispute that during Chief Morris's tenure, the department was subject to the requirements of Initiative 200 (I-200), codified at RCW 49.60.400, which prohibits preferential treatment in public employment based on gender, race, ethnicity, or national origin.[1]
¶ 3 During Chief Morris's tenure, competitive promotions within the department were *766 also governed by what is colloquially referred to as the "rule of five." After the City of Seattle Public Safety Civil Service Commission administered a civil service examination of all promotion candidates, it then used the scoresand any other specifically defined employment criteria, such as each candidate's years in serviceto create a list of qualified applicants, ranked in numerical order from the highest-scoring to the lowest-scoring. The person charged with making the promotion decisionhere, Chief Morrispossessed the discretion to fill the open position with any one of the five highest-scoring applicants, without respect to their relative positions on the list.[2]
¶ 4 Before this lawsuit was filed, Chief Morris made 45 promotions to competitive positions. It is undisputed that he promoted the top-scoring applicant on the Civil Service Commission list in 41 of the 45 instances.
¶ 5 In the other four instancesthose in which Chief Morris promoted someone other than the top-scoring applicantthe promoted person belonged to a racial or ethnic minority group, while the top-scoring person was a white male.
¶ 6 In the first out-of-order promotion, Albert Smalls, an African American, was promoted by Chief Morris to the position of captain from the position of lieutenant. At the time of his promotion, Smalls was ranked as number 10 out of the 37 candidates on the Civil Service Commission promotion list.[3] Chief Morris explained this deviation from the promotion list by stating that Smalls' special work experience made him the ideal fit for the position.[4]
¶ 7 The second out-of-order promotion was that of Marcos Diaz, a Cuban American. Diaz was promoted to the position of fireboat pilot from the position of lieutenant. Diaz was placed second on the promotion list behind Daniel Peterson, who was white and non-Hispanic. In a letter responding to inquiries by the Seattle Firefighters Union (IAFF Local 27) concerning promotions deviating from the Civil Service Commission promotion list, Chief Morris stated that his decision to promote Diaz over Peterson "was based upon his greater depth of experience both as a Marine Division Lieutenant and Acting Captain as well as his overall experience within the Department," and because Diaz had "outstanding qualifications and experience as both Deckhand[ ] and Acting Fireboat Pilot[ ]." While Diaz had indeed served in the department longer overall than had Peterson, he had in fact never served either as a deckhand or as an acting fireboat pilot.
¶ 8 The third out-of-order promotion was that of Preston Bhang, an Asian American. Bhang was promoted to the position of captain from the position of lieutenant. Bhang was promoted over two higher-scoring white males. The position for which Bhang was hired was captain of the department's fire alarm centerthe dispatch center that processes 911 calls. Chief Morris cited Bhang's "experience in the dispatch center" and "intimate knowledge" of the equipment used there as the reason for his decision to hire Bhang instead of the top-ranked candidate.
¶ 9 The fourth out-of-order promotion was that of Eric Lanier over Dumont. Dumont *767 and Lanier applied for promotion from the position of deckhand to an open fireboat engineer position. Fireboat engineers oversee the mechanical operation of boats employed by the marine division of the department to fight fires that occur on salt water on Elliott Bay and on fresh water on Lake Union and Lake Washington. The particular position for which Dumont and Lanier were competing was one of a group of new engineer positions, the rest of which had already been filled based on the order ranking provided by the Civil Service Commission promotion lists.
¶ 10 In contrast to most other competitive positions within the department, applicants for the position of fireboat engineer are required to take an examination specially crafted to test the position's unique requirements. Specifically, the fireboat engineer examination is designed by Chief Fireboat Engineer Richard Chester, the department's senior fireboat engineer, to determine the most qualified candidate for the position. The test includes both written and practical components, the results of which are added together to give the applicant's total score. The maximum possible score of 100 is then combined with a possible 10 additional points for "in-service credit," which is computed as one-half point for each full year of service in the department. Accordingly, the total maximum possible score of 110 points on the examination specifically provides a quantification of both the applicant's knowledge of the position's requirements and practical skill in implementing that knowledge, as well as the express quantification of the applicant's experience in the department.
¶ 11 Only three candidates passed the examination in 2003: Dumont, Lanier, and Jose Parra. Dumont received an exam score of 99.03 and an in-service credit score of 6, giving him an overall score of 105.03 and placing him first on the Civil Service Commission promotion list. Parra received a perfect exam score of 100, but had only 3.5 in-service credit points, and thus ranked lower overall than Dumont, having a total score of 103.50. Lanier received an exam score of 83.95 and the maximum in-service credit score of 10, giving him an overall score of 93.95, which ranked him third on the promotion list.
¶ 12 When the 2003 position came open, Parra was classified as "delayed eligible," meaning that he did not have sufficient in-service credit to qualify for the position. Thus, there were in effect only two eligible candidates for the position: Dumont, who had placed first on the promotion list, and Lanier, who had placed last, more than 11 points lower than Dumont.
¶ 13 Chief Morris and Assistant Fire Chief Michael Johnson then interviewed Dumont and Lanier. According to both Dumont and Chief Morris, questioning during the interview was limited to each applicant's background, experience, and views on various department policies.
¶ 14 In addition to the candidates' relative rankings on the Civil Service Commission promotion list and their responses during the interviews, Chief Morris had access to the applicants' personnel files. Lanier's personnel file indicated that he had been subjected to official discipline 17 times during the course of his careerincluding seven instances of failing to report for duty, two instances of tardiness, five instances of improperly reporting a disability, two instances of making unauthorized long-distance telephone calls, and one instance of causing a preventable accident. This conduct resulted in eight official reprimands, assorted demerits, a fine, and two separate suspensions from duty. The record further indicated that Lanier has been subject to 10 moremore than twice the number ofinstances of official discipline than the next-most disciplined officer who received a promotion during Chief Morris's tenure. Dumont's file indicated that he had never been officially disciplined by the department.
¶ 15 Chief Morris promoted Lanier.
¶ 16 In response to an inquiry by the firefighter's union regarding his reasons for deviating from the promotion list, the only explanation that Chief Morris gave for hiring Lanier over Dumont was Lanier's greater experience in the marine division of the department.
*768 ¶ 17 Thereafter, Dumont sued the City of Seattle, alleging that Chief Morris's decision to promote Lanier over him had been impermissibly based on Lanier's African-American race, in violation RCW 49.60.400 (I-200), and that the promotion violated the City's civil service ordinances.
¶ 18 During discovery, Chief Morris asserted for the first time that, in addition to Lanier's greater experience, his promotion over Dumont was justified because the position of fireboat engineer is a "specialty position," and, thus, as in the other three instances in which Chief Morris deviated from the Civil Service Commission's merit promotion list, Lanier's promotion was justified by the special requirements of the job. Nonetheless, Chief Morris also admitted that the fireboat engineer examination was specifically and solely designed to test the qualifications of applicants to serve as fireboat engineers.
¶ 19 The City moved for summary judgment dismissal of Dumont's claims. In its motion, the City did not dispute that Dumont's complaint established a prima facie case that Chief Morris's hiring of Lanier had violated RCW 49.60.400 under the legal test typically applied to claims of racial discrimination brought pursuant to the Washington Law Against Discrimination (WLAD), chapter 49.60 RCW. Rather, the City based its motion almost entirely on the proposition that none of the evidence introduced by Dumont could support an inference that Chief Morris's stated reasons for promoting Lanier over Dumont were pretextual and that the actual reason for the promotion was the exercise of an unlawful racial preference by Chief Morris.
¶ 20 In opposition to the City's motion, Dumont presented the deposition testimony of Chief Fireboat Engineer Chester that the fireboat engineer examination had been designed to take into account all unique requirements of the position, that Lanier's score on the examination was significantly lower than Dumont's, and that, in his opinion, Dumont had been the more qualified applicant for the position.
¶ 21 The trial court granted the City's motion for summary judgment, dismissing Dumont's lawsuit.
¶ 22 Dumont appeals.

II
¶ 23 "On an appeal from summary judgment, the appellate court engages in the same inquiry as the trial court, construing the facts and reasonable inferences therefrom in the manner most favorable to the nonmoving party to ascertain whether there is a genuine issue of material fact." Sellsted v. Wash. Mut. Sav. Bank, 69 Wash.App. 852, 857, 851 P.2d 716 (1993), overruled on other grounds by Mackay v. Acorn Custom Cabinetry, Inc., 127 Wash.2d 302, 898 P.2d 284 (1995). In other words, our "review is de novo," and "facts and reasonable inferences therefrom are construed most favorably to the nonmoving party." Korslund v. Dyncorp Tri-Cities Servs., Inc., 156 Wash.2d 168, 177, 125 P.3d 119 (2005). Summary judgment is proper only "if reasonable persons could reach but one conclusion from the evidence presented." Korslund, 156 Wash.2d at 177, 125 P.3d 119.

III
¶ 24 The sole issue on appeal is whether a genuine issue of fact exists as to whether Chief Morris's stated justifications for promoting Lanier were pretextual. Viewing the evidence in the light most favorable to Dumont, we conclude that there are material issues of fact, precluding summary judgment dismissal. Before further addressing this issue, however, we must first discuss the analytical framework applicable to a challenge to a governmental hiring decision brought pursuant to RCW 49.60.400.
¶ 25 RCW 49.60.400 prohibits the exercise of racial preferences in any aspect of public employment, regardless of the race of the party alleging injury, and provides a separate cause of action for its violation by incorporating the remedies available under other sections of the WLAD. RCW 49.60.400 provides, in pertinent part, that:
(1) The state shall not discriminate against, or grant preferential treatment to, *769 any individual or group on the basis of race, sex, color, ethnicity, or national origin in the operation of public employment....
....
(8) The remedies available for violations of this section shall be the same, regardless of the injured party's race, sex, color, ethnicity, or national origin, as are otherwise available for violations of Washington antidiscrimination law.
¶ 26 In order to analyze discrimination claims brought under the WLAD, Washington courts have long used the "evidentiary burden-shifting protocol" established by the United States Supreme Court to analyze discrimination claims brought pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2000e-17, in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). See Hill v. BCTI Income Fund-I, 144 Wash.2d 172, 23 P.3d 440 (2001), overruled on other grounds by McClarty v. Totem Elec., 157 Wash.2d 214, 137 P.3d 844 (2006).
¶ 27 Under this burden-shifting framework, "[t]he plaintiff bears the first intermediate burden, namely, that of setting forth a prima facie case of unlawful discrimination." Hill, 144 Wash.2d at 181, 23 P.3d 440 (citing McDonnell Douglas, 411 U.S. at 802, 93 S.Ct. 1817). "If a prima facie case is established, a `legally mandatory, rebuttable presumption' of discrimination temporarily takes hold ... and the evidentiary burden shifts to the defendant to produce admissible evidence of a legitimate, nondiscriminatory explanation for the adverse employment action sufficient to `raise[ ] a genuine issue of fact as to whether [the defendant] discriminated against the plaintiff.'" Hill, 144 Wash.2d at 181, 23 P.3d 440 (quoting Burdine, 450 U.S. at 254-255, 101 S.Ct. 1089). Finally, "[o]nce the presumption is removed, the burden of proof shifts back to the plaintiff, who must then `be afforded a fair opportunity to show that [defendant's] stated reason for [the adverse action] was in fact pretext.'" Hill, 144 Wash.2d at 182, 23 P.3d 440 (quoting McDonnell Douglas, 411 U.S. at 804, 93 S.Ct. 1817). Only if the plaintiff proves incapable of making this showing does "the defendant become[ ] entitled to judgment as a matter of law." Hill, 144 Wash.2d at 182, 23 P.3d 440 (citing Grimwood v. Univ. of Puget Sound, Inc., 110 Wash.2d 355, 365, 753 P.2d 517 (1988)).
¶ 28 Because the courts of our state have long analyzed the viability of claims brought pursuant to the WLAD by using this burden shifting framework, and because RCW 49.60.400 expressly provides that its remedies are the same as those available for other violations of the WLAD, we conclude that the burden-shifting framework also applies to claims brought pursuant to RCW 49.60.400.
¶ 29 However, because RCW 49.60.400 has a different historical genesis and contains different language than do the other provisions of the WLAD, we must adapt the framework of the traditional prima facie case to conform our analysis to that history and language. The statute succinctly states its own purpose: to prohibit discrimination or preferential treatment of any "group on the basis of race, sex, color, ethnicity, or national origin." RCW 49.60.400(1). This is reflective of the manner in which I-200 was promoted as a citizens' initiative-not as a complete prohibition on policies that are aimed at promoting workplace diversity, but instead as a limitation on policies that give factors such as race more weight than job applicants' relative qualifications. See Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1, 149 Wash.2d 660, 687, 72 P.3d 151 (2003). Put more simply, RCW 49.60.400 does not act as a complete bar to the consideration of the listed categories in some contexts, or to the promotion of diversity in public workplaces generally.
¶ 30 On the contrary, our Supreme Court has been very explicit: systems that are racially cognizant but that do not specifically advantage one racial group to the detriment of another do not implicate the terms "discriminate" or "grant preference" as they are used in RCW 49.60.400. Parents Involved in Cmty. Schs., 149 Wash.2d at 686, 72 P.3d 151. Rather, "racially neutral programs designed to foster and promote diversity ... would be permitted by the initiative." Parents Involved in Cmty. Schs., 149 Wash.2d at 687, *770 72 P.3d 151. As our Supreme Court has pointed out, the ballot statement in favor of I-200 itself stated that the initiative "does not end all affirmative action programs. It prohibits only those programs that use race or gender to select a less qualified applicant over a more deserving applicant for a public job, contract or admission to a state college or university." Parents Involved in Cmty. Schs., 149 Wash.2d at 687, 72 P.3d 151.
¶ 31 Given the unique purpose and distinct language used in RCW 49.60.400, it is necessary to adapt the traditional prima facie test that a plaintiff alleging a violation of the statute must satisfy. As our Supreme Court has recognized, the factors considered in the McDonnell Douglas/Burdine analysis "may vary depending on the individual case." Dean v. Mun. of Metro. Seattle-Metro, 104 Wash.2d 627, 637, 708 P.2d 393 (1985) (citing Burdine, 450 U.S. at 257, 101 S.Ct. 1089).
¶ 32 The first element of the prima facie case as it is generally articulatedthat the plaintiff is a member of a protected classis inapplicable here. RCW 49.60.400 prohibits both discrimination against and the exercise of preferences in favor of "any individual or group on the basis of race, sex, color, ethnicity, or national origin in the operation of public employment." RCW 49.60.400 (emphasis added). Under the statute, whether "the plaintiff is a member of a protected class" is a meaningless inquiry. All persons in public employment are protected, regardless of race, sex, color, ethnicity, or national origin.
¶ 33 The remaining elements of the I-200 prima facie case are similar (but not identical) to those traditionally stated. A plaintiff alleging that a government agency violated RCW 49.60.400 by impermissibly relying on race, sex, color, ethnicity, or national origin as a factor in a promotion decision must put forth evidence from which a jury could conclude that he or she (1) was qualified and applied for a promotion, (2) was not promoted, and (3) a less-qualified candidate of a different race, sex, color, ethnicity, or national origin was instead promoted.[5]
¶ 34 Here, there is no dispute that Dumont produced evidence that satisfies this test. Dumont is a white male who was qualified to serve as a fireboat engineer. He applied for promotion to that position. He was not promoted. Lanier, who is African American, was instead promoted. Dumont scored 99.03 points on a test deliberately designed to measure an applicant's qualifications to be a fireboat engineer. Lanier scored 83.95. The department's highest ranking fireboat engineer testified that Dumont was the more qualified candidate.
¶ 35 Under the McDonnell Douglas/Burdine framework, once the plaintiff makes out the required prima facie case, "the evidentiary burden shifts to the defendant to produce admissible evidence of a legitimate ... explanation" for the allegedly unlawful conduct. Hill, 144 Wash.2d at 181, 23 P.3d 440 (citing Burdine, 450 U.S. at 254 n. 7, 101 S.Ct. 1089). This requirement is equally applicable in an action alleging that a public employer violated RCW 49.60.400 by impermissibly relying on race to promote a less-qualified candidate over a more-qualified candidate. After the plaintiff makes the required prima facie showing, the employer must then come forward with an explanation that the promotion was in fact made for a reason other than the promoted person's race.
¶ 36 There is likewise no dispute that the City met its burden of production under this second step of the burden-shifting framework. From the outset, Chief Morris and the department have maintained that Lanier was promoted over Dumont due to his greater experience in the department generally and in the marine division of the department specifically. In addition, after Dumont sued, Chief Morris asserted that the fireboat engineer *771 position is a "specialty position," justifying departure from the promotion lists.
¶ 37 The final step of the McDonnell Douglas/Burdine burden-shifting analysis constitutes the crux of the dispute herein. Once an employer articulates a legitimate, nondiscriminatory reason for its decision, the "burden of proof shifts back to the plaintiff, who must then `be afforded a fair opportunity to show that [defendant's] stated reason for [the adverse action] was in fact pretext.'" Hill, 144 Wash.2d at 182, 23 P.3d 440 (quoting McDonnell Douglas, 411 U.S. at 804, 93 S.Ct. 1817). The parties vigorously dispute whether Dumont introduced sufficient relevant, probative evidence by which a jury could reasonably conclude that Chief Morris's stated reasons for promoting Lanier over Dumont were pretextual, as well as insofar as it was necessary to do so to defeat a motion for summary judgmentto introduce evidence by which the jury could reasonably conclude that Chief Morris actually promoted Lanier instead of Dumont substantially because Lanier is African American. We conclude that Dumont made such a showing.
¶ 38 In Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000), the United States Supreme Court concluded that, under Title VII, the standard for determining whether a plaintiff alleging racial discrimination has introduced sufficient evidence to defeat judgment as a matter of law is the "hybrid-pretext" standard. The Court explained that:
[w]hether judgment as a matter of law is appropriate in any particular case will depend on a number of factors. Those include the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law.
Reeves, 530 U.S. at 148-49, 120 S.Ct. 2097.
¶ 39 In Hill, our Supreme Court adopted the hybrid-pretext standard announced in Reeves as the evidentiary burden that must be met to survive a motion for judgment as a matter of law in cases brought pursuant to the WLAD: "while a McDonnell Douglas prima facie case, plus evidence sufficient to disbelieve the employer's explanation, will ordinarily suffice to require determination of the true reason for the adverse employment action by a fact finder in the context of a full trial, that will not always be the case." Hill, 144 Wash.2d at 185, 23 P.3d 440 (emphasis and footnote omitted).
¶ 40 Thus, under Washington law, there are two conceptually distinct inquiries that must be made to determine whether a plaintiff who alleges that a public employer violated RCW 49.60.400 has introduced sufficient evidence that the employers' stated rationale is pretextual in order to proceed to trial: (1) whether the plaintiff could introduce relevant, admissible evidence by which a reasonable jury could infer that the stated justification for the promotion was false, and (2) whether the plaintiff could introduce relevant, admissible evidence by which a reasonable jury could infer that the actual reason for the promotion was the promoted person's race, gender, ethnicity, or national origin. The first showing is always required. The second showing may be required if the plaintiff's evidence of falsehood is weak.
¶ 41 Viewing the evidence in the light most favorable to Dumont, we conclude that he has met the evidentiary burden required by Hill. There are material issues of fact as to whether Chief Morris's stated justification for Lanier's promotion was false, as well as to whether the actual reason was Lanier's race.
¶ 42 In order to demonstrate on summary judgment that an employer's stated rationale for an employment decision was pretextuali.e., was "unworthy of belief" the employee-plaintiff must produce evidence from which a trier of fact could infer that the employer's "articulated reasons" for the employment decision "(1) have no basis in fact; (2) were not really motivating factors for the decision; or (3) were not motivating factors in employment decisions for other employees in the same circumstances." Kirby v. City of Tacoma, 124 Wash.App. 454, 467, 98 P.3d 827 (2004). For purposes of meeting this burden, *772 it is well established that, under Washington law, it is "improper to require every plaintiff to produce `direct evidence of discriminatory intent.'" Hill, 144 Wash.2d at 179, 23 P.3d 440 (quoting U.S. Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711, 714 n. 3, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983)). Rather, "`[c]ircumstantial, indirect and inferential evidence will suffice to discharge the plaintiff's burden.'" Hill, 144 Wash.2d at 180, 23 P.3d 440 (quoting Sellsted, 69 Wash. App. at 860, 851 P.2d 716). Evidence of a racially motivated employment decision may be direct (for example, discriminatory statements by a decision-maker), but it may also be comparative (for example, a showing that the promoted party was significantly less qualified) or statistical (for example, a showing of a significant pattern of the employer promoting members of one race over better-qualified members of another race). See 1 BARBARA T. LINDEMANN & PAUL GROSSMAN, EMPLOYMENT DISCRIMINATION LAW 60-82 (4th ed.2007) (collecting cases). Dumont has proffered both comparative and statistical evidence that support the inference that Chief Morris's stated reasons were false and that the actual reasons violated RCW 49.60.400.
¶ 43 The statistical evidence is straightforward. In every single instance that Chief Morris promoted someone other than the top-scoring applicant, he promoted a member of a racial or ethnic minority over a white male. Dumont has presented evidence on summary judgment that the converse is not the case: in no instance did Chief Morris deviate from the Civil Service Commission rankings to promote a white person over a minority person. Moreover, Dumont presented evidence that Chief Morris also never promoted a lower-ranked white person over another, higher-ranked white person. Although Dumont has not yet provided expert testimony as to these statistics, the evidence that he has provided supports the inference that the only apparent characteristic shared by the persons promoted out of order is that they were racial or ethnic minority persons. When combined with the fact that Chief Morris never promoted a non-minority person out of order based on their greater experience, this fact constitutes evidence from which a jury could conclude that minority status was the actual reason for Chief Morris's out-of-order promotion of Lanier.
¶ 44 Dumont also presented comparative evidence of pretext. For example, in addition to showing that he scored significantly higher than did Lanier on the fireboat engineer examination, Dumont presented evidence that Lanier had been subject to more than twice the number of instances of official discipline than the next most-disciplined officer promoted by Chief Morris. Although it might be probative with respect to the ultimate burden of persuasion at trial, the City's assertion that Chief Morris gave no attention to the applicants' disciplinary histories does not negate the inference arising from these disparities in Lanier's and Dumont's professional records. Dumont presented evidence that he was, in fact, more qualified to serve as fireboat engineer than was Lanier. Evidence of superior qualifications alone "may suffice, at least in some circumstances, to show pretext." Ash v. Tyson Foods, Inc., 546 U.S. 454, 457, 126 S.Ct. 1195, 163 L.Ed.2d 1053 (2006).
¶ 45 In addition, the employer's explanations may also be considered in determining pretext. Specifically relevant here, "when these explanations ... change over the course of an action ... courts may consider this as evidence that the employer's proffered explanation is pretextual." LINDEMAN & GROSSMAN, supra, at 85 (collecting cases).
¶ 46 Here, viewing the evidence in the light most favorable to Dumont, it appears that Chief Morris has in this litigation attempted to justify Lanier's promotion over Dumont on a basis that he never asserted before Dumont filed this lawsuit: that the Fireboat Engineer position is a "specialty position," justifying departure from Chief Morris's standard practice of hiring the highest-scoring applicant. While the introduction of new justifications for the employment decision is almost never sufficient by itself to show pretext, "[s]ubstantial changes over time in the employer's proffered reason for its employment decision support a finding of pretext." Kobrin v. Univ. of Minn., 34 F.3d 698, 703 (8th Cir.1994).
*773 ¶ 47 Dumont has produced evidence that supports an inference that Chief Morris's stated justifications for Lanier's promotion were false. Under the hybrid-pretext test adopted by Hill, that alone will usually suffice to defeat an employer's motion for summary judgment on a claim brought pursuant to RCW 49.60.400. Further, Dumont's evidence was not limited to evidence from which it could be inferred that Chief Morris's stated justifications were false. He also introduced evidence from which a jury could reasonably infer that Chief Morris's actual motivation was a policy of promoting members of racial or ethnic minorities. The only characteristic that appears to link Chief Morris's rare deviations from the Civil Service promotion lists, other than his proffered justifications of greater experience, is that the promoted persons belonged to a racial or ethnic minority group. From this, a jury could conclude that Chief Morris relied upon greater experience as a justification for departing from the Civil Service promotion lists only when promoting minority candidates due to their race. Accordingly, because material issues of fact exist as to whether Chief Morris's stated reason for promoting Lanier was pretextual, summary judgment should not have been granted.
¶ 48 Reversed and remanded.
¶ WE CONCUR: LEACH, J., and SCHINDLER, C.J.
NOTES
[1] RCW 49.60.400(1) provides:

The state shall not discriminate against, or grant preferential treatment to, any individual or group on the basis of race, sex, color, ethnicity, or national origin in the operation of public employment, public education, or public contracting.
[2] At the beginning of Morris's tenure, he also had the discretion to promote any candidate in the top 25 percent of the civil service list, even if that candidate was not among the five highest scoring applicants, creating a "rule of five or 25 percent." In the context of Seattle Police Department hiring, the 25 percent possibility was determined by this court to be inconsistent with the purpose of the statute governing civil service advancement, and was thus declared invalid, severing it from the "rule of five." The City did not further challenge this decision. See Seattle Police Officers Guild v. City of Seattle, 151 Wash.2d 823, 829-30, 92 P.3d 243 (2004). Following this ruling, the Seattle Fire Department, as with the Seattle Police Department, has exclusively applied the "rule of five."
[3] Smalls was originally ranked 19th on the promotion list, but nine candidates ranked above him were first promoted, precisely in the order in which their names appeared on the promotion list.
[4] A number of the candidates ahead of Smalls on the Civil Service Commission promotion list brought suit against the City, alleging, similarly to what was alleged in Seattle Police Officers Guildand presumably because Smalls was within neither the top five nor the top 25 percent of applicantsthat the selection of Smalls violated the merit selection objectives of the civil service promotion statutes. The City settled that suit.
[5] Unlike a plaintiff bringing suit under federal statutes, where a plaintiff need only present evidence showing that an "equally or less qualified" person was promoted, see, e.g., Denney v. City of Albany, 247 F.3d 1172, 1183 (11th Cir.2001), a plaintiff suing under RCW 49.60.400 must present evidence that the promoted person was actually less qualified. This is so because I-200 did not "end all affirmative action programs. It prohibit[ed] only those programs that use race or gender to select a less qualified applicant over a more deserving applicant for a public job, contract or admission to a state college or university." Parents Involved in Cmty. Schs., 149 Wash.2d at 687, 72 P.3d 151 (quoting ballot statement in favor of I-200).