241 P.3d 787 (2010)
Ronald W. MOORE, Appellant,
v.
L. Billie HAGGE, Defendant,
City of Des Moines, Respondent.
Nos. 63612-0-I, 63882-3-I.
Court of Appeals of Washington, Division 1.
August 16, 2010.
Publication Ordered November 1, 2010.
*788 Richard C. Robinson, Layman Layman & Robinson PLLP, Seattle, WA, John Randall Layman, JJ Jesse Junior Thompson, Layman Layman & Robinson PLLP, Spokane, WA, Jesse Valdez, Valdez Lehman, PLLC, William Cornell Ruthford, Ruthford Law, Inc., Bellevue, WA, for Appellants.
Brenda Louise Bannon, Keating Bucklin & McCormack Inc PS, Seattle, WA, for Respondent.
LEACH, A.C.J.
¶ 1 Ronald Moore appeals the summary dismissal of his claim against the City of Des Moines ("the City"). He sustained serious injuries when he and a vehicle operated by L. Billie Hagge collided on South 240th Street in the City. He has no memory of the collision, and no one saw him immediately before it. To show that the City's failure to provide a safe roadway caused the accident, Moore relied on his own testimony about his routine walking habits and expert testimony about roadway conditions in the accident vicinity. At best, this evidence only shows that the City's negligence might have caused Moore's injuries. Because it does not show that, but for the City's alleged failure, Moore would not have been injured, we affirm the summary judgment in favor of the City. We also affirm the exclusion of those portions of Moore's testimony and his expert that the trial court found to be based on speculation.

FACTS
¶ 2 On October 31, 2006, around 5:00 p.m., Hagge was driving west on South 240th Street in the City when her vehicle and Moore collided. Moore was knocked unconscious and landed in a ditch on the north side of South 240th Street in the 900 block area, near where South 240th Street intersects with 9th Place South.
¶ 3 South 240th Street is a two-lane, two-way city collector arterial with a posted speed limit of 35 m.p.h.[1] It connects residential areas of the City south of the Kent-Des Moines Road to Pacific Highway South to the east and Marine View Drive to the west. Originally constructed in the 1890s, the street has an approximate combined roadway surface width of 20 feet with each lane about 10 feet wide. A white reflectorized fog line marks the northern edge of the street. Sequentially, a grass shoulder about five feet wide, an open grass drainage ditch, and a gravel footpath border the fog line.[2] Sections of chain link fencing run along the northern side of the footpath. Just west of 9th Place South, a posted, reflectorized "STOP AHEAD" sign located immediately north of the fog line warns westbound traffic on South 240th Street approaching Marine View Drive South. The crosswalk at the intersection of South 240th Street and 9th Place South is unmarked. The closest marked crosswalk is about 390 feet away at the corner of South 240th Street and Marine View Drive. The accident vicinity has no history of car-pedestrian accidents or pedestrian safety complaints.
*789 ¶ 4 Only Hagge and Miranda Mineard, the driver of the car behind Hagge, witnessed the events leading up to the collision. Neither witness, however, saw where Moore came from, what he was doing just before, or when he collided with Hagge's car. According to Hagge, the sun had just set, and she was driving at 23 m.p.h. with her headlights on when "suddenly something kind of popped on my car."[3] Hagge stopped her car and walked back to see what made contact with her car. Two women, who had arrived at the scene, told Hagge that Moore had "jumped over the ditch and into your car and then he fell back into the ditch." An elderly man also arrived and attempted to assist Moore.
¶ 5 Mineard was driving three car lengths behind Hagge's car at about 30 m.p.h. Mineard testified that Hagge "seemed to be driving in her lane of travel before the collision" and that she did not observe Hagge "swerving in either direction." Like Hagge, Mineard did not see Moore before the collision. She only saw Hagge's brake lights briefly come on before she observed Moore's body flying about 10 feet in the air and then landing in the ditch. Mineard hurried over to Moore and then called 911. Initially, no one was nearby, but a few people later came onto the scene. Mineard did not observe, or hear anyone else say, that Moore jumped over the ditch into Hagge's car.
¶ 6 Officer Paul Guest arrived on the scene around 5:14 p.m. At that time, Moore was being placed in an ambulance, so Guest spoke with Hagge and Mineard. Guest determined that no one at the scene actually saw Moore before the collision or Hagge's vehicle collide with Moore. He also reported that the pavement was dry, that the reflectorized lane markings, center buttons, and fog lines were clearly visible, and that the adjacent grass shoulder, open ditch, and gravel footpath were visible. Guest found no precollision scuff or skid marks or postcollision skid marks on the roadway and "no tread marks or any other indication that the Hagge vehicle had left its lane of travel."
¶ 7 According to Guest, Hagge's car came to rest at a slight angle on South 240th Street, just past the "STOP AHEAD" reflectorized warning sign and adjacent to the northern edge of the pavement. He saw damage to Hagge's car on the far right passenger side, consisting of a dent along the side of the hood and a prominent "spider web" crack on the windshield. Guest testified that he was unable to (1) determine the point of impact between Moore and Hagge's vehicle, (2) find evidence that Moore was crossing the street at the time of the collision, or (3) find evidence that Moore was in an unmarked crosswalk at the time of the collision. He concluded that Moore was on the paved surface of South 240th Street at the time of the collision.
¶ 8 Moore suffered a brain injury, spent 30 days in a coma, and received care at the rehabilitation clinic at the University of Washington for several months following the accident before he was able to return to work. Due to his injuries, Moore has no recollection of the accident or of any other events occurring on that day.
¶ 9 On August 24, 2007, Moore filed suit against Hagge and the City. In his complaint, Moore alleged that the City "failed to provide a safe walkway along South 240th Street, East of Marine View Drive that was reasonably obvious and accessible ... forcing Plaintiff, as a pedestrian, to walk dangerously close to or on the traffic lane of South 240th Street and thus breached its duty." This breach "was the proximate cause of the collision between Defendant Hagge's vehicle and Plaintiff."
¶ 10 On February 20, 2009, the City moved for summary judgment, arguing that it owed no duty "to a pedestrian to ensure the safety of crossing a city street at mid-block" and that no evidence supported proximate cause because no one saw the collision and because Moore had no memory of the accident.
¶ 11 The City supported its motion with the declarations of Mineard and Guest, excerpts from Hagge's deposition, and the declarations of two engineering expert witnesses. Daniel Brewer, the City's primary expert witness, opined that "there was no unusual danger in S. 240th Street, in the *790 vicinity where Mr. Moore's accident occurred." Noting that the width of South 240th Street was "typical for an older city collector arterial," Brewer stated that "the existing lane widths are more than adequate for safe vehicular travel." He noted that the City of Des Moines Street Development Standards and the American Association of State Highway and Transportation Officials (AASHTO) standards applied only to new construction.
¶ 12 Brewer also pointed out that Moore assumed that "he was trying to cross S. 240th Street somewhere in the 900 block, from north to south." But since no one saw the actual collision, Brewer stated that any "crossing" by Moore "could have been a mid-block crossing or an intersection crossing." Brewer also found ample sight distance for pedestrians to see oncoming vehicles in either direction, providing "a reasonabl[y] safe opportunity for Mr. Moore to wait in the adjacent grass shoulder area for any traffic to clear before making a decision to cross S. 240th Streetif he had chosen to do so." Brewer also stated that Moore could have used the marked crosswalk at the corner of South 240th Street and Marine View Drive located 390 feet away. Brewer concluded that a marked crosswalk or pedestrian traffic signing at the accident location was unnecessary because there was "no previous car-pedestrian accident history and no significant pedestrian crossing volumes in this area."
¶ 13 In response, Moore submitted his own declaration and the declarations of witnesses who arrived later at the scene of the accident.[4] Moore stated that in October 2006 he had been employed at Evergreen Tree Care for five months. Working five days a week for about five hours per day, Moore's job duties entailed canvassing neighborhoods for trees in need of care. His daily work routine involved parking his car in a central location in the area he was going to cover, canvassing the area on foot, and returning to his car afterward. Moore also described in detail walking habits he developed in his early childhood that he purportedly used while working for Evergreen. He listed the following habits and practices:
a. Whenever I am walking near a roadway and there is a curbed sidewalk for the public, I walk on the sidewalk.
b. Whenever I encounter the absence of a public sidewalk, I walk to the left side of the roadway facing traffic and on the shoulder of the roadway, if possible; where there is a painted line indicating the edge of the traffic lane (a fog line), I stand to the outside of the line, if possible.
c. Whenever I am walking and need to cross a street, I cross where provisions are placed that allow for pedestrian crossing, such as a crosswalk.
d. Whenever I encounter the absence of provisions for pedestrian crossing in the vicinity where I need to cross the street, I cross at the nearest intersection.
e. Before crossing any roadway, I always stand on the sidewalk away from the curbed edge and look both ways for oncoming traffic.
f. Whenever I encounter the absence of a sidewalk and I need to cross a roadway, I stand at the edge of the roadway and look both ways for oncoming traffic.
g. When the traffic stops for me or when there are no oncoming cars, I proceed to cross the street in a perpendicular manner, keeping a lookout for any moving cars.
h. Whenever I encounter a sign that prohibits pedestrian travel, I change my course and find an alternate route to get to my destination. Similarly, if there is a clearly marked route directing pedestrians to use a particular path and it is where I am headed, then I use that marked route.
Despite Moore's lack of memory, he stated that he had practiced these habits on the day of the accident and gave an account of how the accident happened. Essentially, he *791 claimed that he was about to cross from the north side of South 240th Street to its south side at the intersection of 9th Place South when Hagge's vehicle struck him.
¶ 14 Moore also submitted the declaration of William Neuman, his engineering expert witness. Neuman opined that the accident vicinity was an "inherently dangerous location" due to "the two narrow traffic lanes, high traffic volumes, narrow shoulders (4.7 feet to the west), ... lack of pedestrian access to and from the pathway, and high likelihood of pedestrian crossing at 9th Place South with surrounding residential neighborhoods." Neuman emphasized that the traffic volume on South 240th Street surpassed its classification as a collector arterial and should be considered a minor arterial.[5] He estimated that, in 2006, South 240th Street supported more than 5,000 vehicles per day, based on data from 2008 regarding the volume of trafficor average daily traffic counton sections of South 240th Street and Marine View Drive. Neuman pointed out that the City's Street Development Standards required minor arterials to have a width of 44 feet and that the AASHTO standards listed 12 feet as the standard pavement width.
¶ 15 Neuman further testified that the accident occurred as Moore described it. Neuman concluded that the inherent dangers of the location were "more likely than not a substantial factor" in causing Moore's injuries and that, had the City implemented the safeguards, such as improving the north shoulder or installing crossing provisions and signage, Hagge's vehicle "more likely than not" would not have struck Moore.
¶ 16 On March 16, 2009, the City filed a reply and an objection to the declarations of Moore and Neuman. After Moore responded two days later, the City moved to strike both declarations in their entirety.
¶ 17 On April 17, 2009, the court excluded the portions of the declarations of Moore and Neuman related to how the accident happened and how the accident might have been prevented had the City taken additional precautions. It admitted the portion of Moore's declaration describing his walking habits. The court granted summary judgment in favor of the City, stating that, even with the habit testimony, Moore's showing on proximate cause was insufficient.[6]
¶ 18 On April 24, 2009, Moore filed a motion for reconsideration, which the court denied. Moore appeals.

STANDARD OF REVIEW
¶ 19 We review an order granting summary judgment de novo, engaging in the same inquiry as the trial court.[7] Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law.[8] In determining whether a genuine issue of material fact exists, we construe the facts and reasonable inferences in the light most favorable to the nonmoving party.[9] "In tort actions, issues of negligence and causation are questions of fact not usually susceptible to summary judgment."[10] "But a question of fact may be determined as a matter of law when reasonable minds can reach only one conclusion."[11]
¶ 20 We also review de novo the trial court's rulings excluding portions of the declarations *792 of Neuman and Moore.[12] "The de novo standard of review is used by an appellate court when reviewing all trial court rulings made in conjunction with a summary judgment motion."[13] "This standard of review is consistent with the requirement that evidence and inferences are viewed in favor of the nonmoving party" and the appellate court "conduct[s] the same inquiry as the trial court."[14]

ANALYSIS

Proximate Cause
¶ 21 In Washington, municipalities are generally held to the same fundamental negligence principles as ordinary citizens.[15] A negligence claim consists of three elements: (1) a legal duty owed by the defendant to the plaintiff, (2) breach of that duty, and (3) injury to the plaintiff proximately caused by the breach.[16] This appeal focuses on the proximate cause element. The City argues that Moore's claim fails because he cannot satisfy his burden of producing evidence showing that the City's alleged negligence proximately caused his injuries. We agree.
¶ 22 Proximate cause has two elements: cause in fact and legal causation. The City contends that Moore produced no evidence of cause in fact. "Cause in fact refers to the `but for' consequences of an actthe physical connection between an act and an injury."[17] Ordinarily, cause in fact is a question for the jury.[18] But the court may decide this question as a matter of law if "the causal connection is so speculative and indirect that reasonable minds could not differ."[19] "`The cause of an accident may be said to be speculative when, from a consideration of all the facts, it is as likely that it happened from one cause as another.'"[20] Stated differently,
[I]f there is nothing more tangible to proceed upon than two or more conjectural theories under one or more of which a defendant would be liable and under one or more of which a plaintiff would not be entitled to recover, a jury will not be permitted to conjecture how the accident occurred.[[21]]
Our courts have upheld summary judgment dismissals in negligent road design cases where the plaintiff failed to provide evidence from which cause in fact could be inferred.[22] The trial court relied heavily on Miller v. Likins.[23] We agree that its reasoning and analysis apply here.
¶ 23 In Miller, a car driven by Ralph Likins hit 14-year-old Theodore Quirmbach at a curve in the road.[24] Likins died from causes unrelated to the accident before he could provide any testimony in the suit.[25] Patricia Miller, Quirmbach's mother, sued *793 the city of Federal Way, alleging that it had breached its duty to Quirmbach by "`fail[ing] to adequately or properly perform design, engineering and maintenance duties instrumental to keeping the roads, streets and sidewalks and lighting in a reasonably safe condition for ordinary travel by persons using them.'"[26]
¶ 24 The evidence submitted by the parties provided conflicting accounts of where Quirmbach was standing when he was struck by Likins's car.[27] The city offered both eyewitness and expert declarations supporting its contention that Quirmbach was in the middle of the road when he was struck.[28] In response, Miller submitted the declaration of Wesley Richards, who was standing next to Quirmbach when he was hit.[29] Richards testified that both he and Quirmbach were standing outside the fog line, off the traveled portion of the road, and were not on their skateboards when Likins's car struck Quirmbach.[30] Miller also submitted the expert testimony of Kenneth Cottingham to show how the accident occurred and how the installation of additional safeguards might have prevented the accident by heightening Likins's awareness of pedestrians in the vicinity.[31]
¶ 25 Viewing the evidence in the light most favorable to Miller, the trial court assumed the "`impact occurred outside the fog line'" but granted the city's summary judgment motion.[32] The court also granted the city's motion to exclude the portions of Cottingham's testimony related to how the accident happened.[33]
¶ 26 In affirming both of the trial court's orders, this court emphasized that "to survive summary judgment, the plaintiff's showing of proximate cause must be based on more than mere conjecture or speculation."[34] It further stated that "Washington courts have repeatedly held that in order to hold a governmental body liable for an accident based upon its failure to provide a safe roadway, the plaintiff must establish more than that the government's breach of duty might have caused the injury."[35]
¶ 27 Applying these principles, the court observed that Miller contended that "the accident occurred when Likins' vehicle crossed over the fog line and onto the shoulder of the road."[36] Miller further contended that "if the City had taken additional precautions, such as installing raised pavement markings on the fog line, lowering the speed limit, or posting additional road signs, Likins `would have been likely to be more alerted to possible presence of pedestrians, enabling him to avoid a collision.'"[37] In deciding that these contentions were speculative, the court pointed out that "Likins passed away before he could give his own sworn account of how the accident happened. There is no direct or circumstantial evidence showing that Likins was in fact confused or misled by the condition of the roadway."[38] The court further held,
[T]he most Miller can show is that the accident might not have happened had the City installed additional safeguards. Miller's contentions `can only be characterized as speculation or conjecture.' Accordingly, a jury could not reasonably infer that had the City implemented the additional precautions Cottingham suggested, Likins *794 would not have crossed the fog line and hit Quirmbach.[[39]]
Because Miller had not met her burden of producing evidence showing that the city's alleged negligence proximately caused Quirmbach's injuries, the court concluded that summary judgment was proper.[40]
¶ 28 This case is similar to Miller in important respects. Moore concedes that "the direct evidence clearly supports the fact that he was struck by Ms. Hagge's car while on the improved, far-right portion of South 240th Street." At the same time, there is no evidence establishing the point of impact, no evidence showing where Moore came from, and no evidence about what he was doing just before or at impact. Moore contends that he was preparing to cross at the intersection of 9th Place South and South 240th Street when he was struck. Moore also contends that if the City had installed the additional safeguards at the intersection, "he would have been alerted to the [inherently dangerous] condition[s of the roadway], taken a different course of action, and would not have been struck by Ms. Hagge." But, as in Miller, Moore cannot give his own account of how the accident happened because he has no recollection of it. There is no evidence that the additional safeguards would have made Moore more aware of the conditions of the roadway at the time of the accident. As was true for the driver in Miller, there is no evidence that Moore was confused or misled about the roadway conditions. Thus, there is no direct or circumstantial evidence showing that the City's alleged negligence caused his injuries. As in Miller, the most that Moore can show is that the accident might not have happened if the City had installed additional safeguards.
¶ 29 Moore attempts to distinguish Miller. He claims that his habit testimony supports a reasonable inference that he "would have changed his behavior on the date of the accident had the City complied with their [sic] duties," whereas in Miller "there never would be any evidence from which such conduct could be inferred" because Likins passed away before offering any testimony. Moore further cites Little v. Countrywood Homes, Inc.[41] as support that "evidence of his habit ... satisf[ies] causation."
¶ 30 We disagree. We do not rule on the admissibility of Moore's habit testimony, but note that whether evidence is sufficient to establish proximate cause presents a different question. Little illustrates this distinction between the admissibility of testimony under ER 406[42] and its sufficiency, and it undermines, rather than supports, Moore's argument.[43]
¶ 31 In that case, Jared Little was injured while installing gutters on a house for Countrywood Homes, Inc.[44] Little had no memory of the accident, and there were no witnesses.[45] Little sued Countrywood for negligence, claiming that Countrywood had failed to comply with regulations requiring that ladders be secured at both the top and bottom and used on stable surfaces.[46] Countrywood moved for summary judgment, arguing, among other things, that Little could not prove proximate cause.[47] The trial court granted the motion.[48]
*795 ¶ 32 On appeal, this court agreed that Little failed to produce evidence sufficient to establish proximate cause.[49] The court noted that Little had submitted expert testimony showing that Countrywood had committed numerous safety violations, and Countrywood had presented evidence disputing the manner in which the ladder was required to be secured as well as evidence that the ground where the ladder was lying was not unusually wet or muddy.[50] In affirming the trial court, this court concluded,
One may speculate that the ladder was not properly secured at the top or that the ground was unstable. But even assuming that those conditions constituted breaches of a duty that Countrywood owed Little, he did not provide evidence showing more probably than not that one of those breaches caused his injuries.[[51]]
¶ 33 This court also rejected Little's argument that evidence of his habit of using a ladder to install gutters cured the lack of evidentiary support on the element of proximate cause: "Little ... needed to provide more than evidence that he was working on a ladder, which was required to be secured at the top and placed on stable ground. He needed to establish proof that Countrywood's negligence caused his injuries."[52] In other words, "Little needed to present proof sufficient to allow a reasonable person to conclude that the harm more probably than not happened in such a way that the moving party should be held liable."[53]
¶ 34 Here, similar to Little, Moore has no memory of the accident, and no one else witnessed the events just before the collision. Evidence of Moore's walking habits cannot cure the lack of evidentiary support for the element of proximate cause because this evidence does not establish that the harm, more probably than not, happened in such a way that the City should be held liable.[54] Moore's habit evidence does not make any one sequence of events leading to impact more likely than one or more alternate sequences where the City has no liability.
¶ 35 Moore also relies on Wojcik v. Chrysler Corp.[55] In that case, Wojcik sustained injuries when his car went out of control on a Kitsap County road, struck a utility pole on the side of the road, and overturned.[56] Wojcik sued the county, alleging that inadequate striping and maintenance of the road's shoulder had proximately caused his injuries.[57] On appeal, Division Two reversed the trial court's grant of summary judgment in favor of the county, holding that the evidence presented by Wojcik created an issue of material fact. Specifically, the court pointed out that Wojcik had submitted, among other things, an affidavit and excerpts of deposition testimony in which he provided an account of what happened just before the collision based on his recollection.[58]
¶ 36 Here, in contrast to Wojcik, Moore was unable to provide any evidence about how the accident occurred due to his memory loss and the lack of any eyewitness. As stated above, Moore's habit testimony does not cure this defect. Because there is no evidence establishing the events immediately before the collisionin particular, where Moore was coming from or what he was doing just before he and the Hagge vehicle collidedWojcik is distinguishable.
¶ 37 In conclusion, in light of the evidence before the trial court, it properly granted summary judgment in favor of the City because *796 Moore failed to produce sufficient evidence on the element of proximate cause.

Neuman Declaration
¶ 38 Moore argues that the superior court erred in striking paragraphs 17 through 20 of Neuman's declaration. The City responds that the exclusion was proper because those paragraphs were speculative and lacked a factual basis.
¶ 39 The trial court has wide discretion in ruling on the admissibility of expert testimony.[59] This court will not disturb the trial court's ruling "`[i]f the reasons for admitting or excluding the opinion evidence are both fairly debatable.'"[60] ER 702 permits testimony by a qualified expert where "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." Courts generally "`interpret possible helpfulness to the trier of fact broadly and will favor admissibility in doubtful cases.'"[61] "It is well established that conclusory or speculative expert opinions lacking an adequate foundation will not be admitted."[62] "In addition, when ruling on somewhat speculative testimony, the court should keep in mind the danger that the jury may be overly impressed with a witness possessing the aura of an expert."[63]
¶ 40 Again, Miller is instructive. The court in Miller affirmed the trial court's exclusion of expert testimony offered to show how the accident occurred. Specifically, Cottingham opined "on a more probable than not basis" that the accident occurred when Likins's vehicle crossed over the fog line and onto the shoulder of the road.[64] Cottingham further testified that Quirmbach was standing outside the fog line and lunged to his right before the collision.[65] In reviewing this testimony, the court stated that it was unclear how Cottingham could testify on a "more probable than not" basis about Quirmbach's position when Cottingham (1) admitted that he had no way of determining the point of impact, (2) performed no quantitative analysis, and (3) based his opinion solely on Richards's declaration, an account that conflicted with eyewitness and expert declarations provided by the city.[66]
¶ 41 Here, like the expert testimony provided in Miller, paragraphs 17 and 18 contain testimony about how the accident occurred. Neuman opined that Moore was "in the process of crossing South 240th Street and thus reasonably in the intersection of 9th Place South and South 240th Street." Neuman also stated that, based on the location of Moore's injuries, Moore was facing south when he was hit. In paragraphs 19 and 20, Neuman testified that, had the City taken certain actions, such as improving the north shoulder, providing for pedestrian access to the gravel footpath, and installing crossing provisions at the intersection, "Ms. Hagge, more likely tha[n] not, would have missed Mr. Moore with her vehicle." These opinions were "stated on a more probable than not basis." Yet, similar to the expert in Miller, Neuman arrives at these opinions without evidence establishing the point of impact and without any quantitative analysis. Arguably, Neuman's testimony is even more speculative than that offered in Miller since Neuman had no eyewitness testimony on which to base his opinions.
¶ 42 We conclude that the trial court properly excluded paragraphs 17 through 20 of Neuman's declaration.[67]

*797 Moore Declaration

¶ 43 Moore argues that the superior court erred in striking paragraphs six through eight of his declaration. The City argues that the exclusion was proper because Moore lacked personal knowledge.
¶ 44 ER 701 governs the admissibility of opinion testimony by lay witnesses. It requires lay opinion be limited to that which is "(a) rationally based on the perception of the witness, (b) [and is] helpful to a clear understanding of the witness' testimony or the determination of a fact in issue."
¶ 45 After listing eight specific walking habits in paragraph five, Moore stated in paragraphs six through eight, "I have no reason to believe that I was not acting in conformity with the foregoing habits and routine practices on October 31, 2006." Based on his habits and subsequent review of the area, Moore gave the following account of the accident:
I was finishing work and returning to my car from the north side of South 240th Street. It was necessary for me to cross from the north side of South 240th Street to the south side because my car was parked off of 9th Place South. Because no crossing provisions were in the vicinity, I prepared to cross at the intersection at 9th Place South. As I stood at the north edge paved portion of South 240th Street, preparing to cross, I looked to my right for oncoming traffic just as Ms. Hagge struck me with her car on my left.
But Moore admits that he has no recollection of any of the events that day. He further testified that he was not familiar with the accident location.[68] Thus, any testimony as to how Moore thought the collision happened violates ER 701.
¶ 46 We conclude that the trial court properly excluded paragraphs six through eight of Moore's declaration.[69]

CONCLUSION
¶ 47 The superior court correctly decided that Moore failed to produce evidence sufficient to show that the City's alleged negligence caused his injuries because the evidence submitted by Moore showed, at best, that the he might not have been injured if the City had installed additional precautions. The court also correctly excluded portions of testimony by Moore and his expert that were based on speculation. We affirm.
WE CONCUR: SCHINDLER, J., and ELLINGTON, A.C.J.
NOTES
[1] The City of Des Moines Street Development Standards define a "collector arterial" as "[s]treets connecting residential neighborhoods with community centers and facilities [with an average daily traffic count] typically between 1,000 to 3,000 [vehicles per day]."
[2] Moore's expert stated that the grassy shoulder was about 4.7 to 6.5 feet wide.
[3] Hagge also testified that she was familiar with the road.
[4] Margot Jordan, Deborah Buckley, and Tom Specht testified that they heard the collision and hurried to the scene. None of them said, or heard anyone else say, that Moore jumped over the ditch into Hagge's car.
[5] The City of Des Moines Street Development Standards define "minor arterial" as "[i]ntracommunity highways connecting community centers and major facilities [with an average daily traffic count] typically between 5,000 to 12,000 [vehicles per day]."
[6] Moore later settled with Hagge.
[7] Dumont v. City of Seattle, 148 Wash.App. 850, 860-61, 200 P.3d 764, (2009) (quoting Sellsted v. Wash. Mut. Sav. Bank, 69 Wash.App. 852, 857, 851 P.2d 716 (1993), overruled on other grounds by Mackay v. Acorn Custom Cabinetry, Inc., 127 Wash.2d 302, 898 P.2d 284 (1995)).
[8] CR 56(c); Vallandigham v. Clover Park Sch. Dist. No. 400, 154 Wash.2d 16, 26, 109 P.3d 805 (2005).
[9] Gossett v. Farmers Ins. Co. of Wash., 133 Wash.2d 954, 963, 948 P.2d 1264 (1997).
[10] Miller v. Likins, 109 Wash.App. 140, 144, 34 P.3d 835 (2001) (citing Ruff v. County of King, 125 Wash.2d 697, 703, 887 P.2d 886 (1995)).
[11] Miller, 109 Wash.App. at 144, 34 P.3d 835 (citing Ruff, 125 Wash.2d at 704, 887 P.2d 886).
[12] Folsom v. Burger King, 135 Wash.2d 658, 663, 958 P.2d 301 (1998).
[13] Folsom, 135 Wash.2d at 663, 958 P.2d 301.
[14] Folsom, 135 Wash.2d at 663, 958 P.2d 301; Lamon v. McDonnell Douglas Corp., 91 Wash.2d 345, 349, 588 P.2d 1346 (1979); Mountain Park Homeowners Ass'n v. Tydings, 125 Wash.2d 337, 341, 883 P.2d 1383 (1994).
[15] Miller, 109 Wash.App. at 144, 34 P.3d 835.
[16] Miller, 109 Wash.App. at 144, 34 P.3d 835.
[17] Hartley v. State, 103 Wash.2d 768, 778, 698 P.2d 77(1985).
[18] Hartley, 103 Wash.2d at 778, 698 P.2d 77.
[19] Doherty v. Mun. of Metro. Seattle, 83 Wash. App. 464, 469, 921 P.2d 1098 (1996); Yong Tao v. Heng Bin Li, 140 Wash.App. 825, 834, 166 P.3d 1263 (2007).
[20] Jankelson v. Sisters of Charity of House of Providence in Territory of Wash., 17 Wash.2d 631, 643, 136 P.2d 720 (1943) (quoting Frescoln v. Puget Sound Traction, Light & Power Co., 90 Wash. 59, 63, 155 P. 395 (1916)).
[21] Gardner v. Seymour, 27 Wash.2d 802, 809, 180 P.2d 564 (1947).
[22] See Johanson v. King County, 7 Wash.2d 111, 122, 109 P.2d 307 (1941); Nakamura v. Jeffery, 6 Wash.App. 274, 276-77, 492 P.2d 244 (1972); Kristjanson v. City of Seattle, 25 Wash.App. 324, 326-27, 606 P.2d 283 (1980).
[23] 109 Wash.App. 140, 34 P.3d 835 (2001).
[24] Miller, 109 Wash.App. at 143, 34 P.3d 835.
[25] Miller, 109 Wash.App. at 143, 34 P.3d 835.
[26] Miller, 109 Wash.App. at 143, 34 P.3d 835 (alteration in original).
[27] Miller, 109 Wash.App. at 143, 34 P.3d 835.
[28] Miller, 109 Wash.App. at 143, 34 P.3d 835.
[29] Miller, 109 Wash.App. at 143, 34 P.3d 835.
[30] Miller, 109 Wash.App. at 143, 34 P.3d 835.
[31] Miller, 109 Wash.App. at 143-44, 147, 34 P.3d 835.
[32] Miller, 109 Wash.App. at 143-44, 34 P.3d 835.
[33] Miller, 109 Wash.App. at 144, 34 P.3d 835.
[34] Miller, 109 Wash.App. at 145, 34 P.3d 835 (citing Ruff, 125 Wash.2d at 707, 887 P.2d 886).
[35] Miller, 109 Wash.App. at 145, 34 P.3d 835 (citing Johanson, 7 Wash.2d at 122, 109 P.2d 307; Wojcik v. Chrysler Corp., 50 Wash.App. 849, 857, 751 P.2d 854 (1988); Kristjanson, 25 Wash. App. at 326-27, 606 P.2d 283).
[36] Miller, 109 Wash.App. at 147, 34 P.3d 835.
[37] Miller, 109 Wash.App. at 147, 34 P.3d 835.
[38] Miller, 109 Wash.App. at 147, 34 P.3d 835 (emphasis added).
[39] Miller, 109 Wash.App. at 147, 34 P.3d 835 (quoting Kristjanson, 25 Wash.App. at 326, 606 P.2d 283).
[40] Miller, 109 Wash.App. at 147, 34 P.3d 835.
[41] 132 Wash.App. 777, 133 P.3d 944 (2006).
[42] ER 406 provides, "Evidence of the habit of a person or of the routine practice of an organization, whether corroborated or not and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice."
[43] See 5A KARL B. TEGLAND, WASHINGTON PRACTICE: EVIDENCE LAW AND PRACTICE § 406.6, at 37 (5th ed. 2007) (citing Little for the proposition that "[i]n some situations, proof of a habit, without more, may simply be insufficient to sustain the applicable burden of proof").
[44] Little, 132 Wash.App. at 778, 133 P.3d 944.
[45] Little, 132 Wash.App. at 778, 133 P.3d 944.
[46] Little, 132 Wash.App. at 779, 780-81, 133 P.3d 944.
[47] Little, 132 Wash.App. at 779, 133 P.3d 944.
[48] Little, 132 Wash.App. at 779, 133 P.3d 944.
[49] Little, 132 Wash.App. at 779, 133 P.3d 944.
[50] Little, 132 Wash.App. at 781, 133 P.3d 944.
[51] Little, 132 Wash.App. at 782, 133 P.3d 944.
[52] Little, 132 Wash.App. at 783, 133 P.3d 944.
[53] Little, 132 Wash.App. at 781, 133 P.3d 944 (citing Gardner, 27 Wash.2d at 808-09, 180 P.2d 564).
[54] The City correctly notes that it is equally plausible that Moore incurred his injuries after tripping and falling in front of Hagge's car. Since "there is nothing more tangible to proceed upon than two or more conjectural theories," summary judgment is therefore appropriate. Gardner, 27 Wash.2d at 809, 180 P.2d 564.
[55] 50 Wash.App. 849, 751 P.2d 854 (1988).
[56] Wojcik, 50 Wash.App. at 850, 751 P.2d 854.
[57] Wojcik, 50 Wash.App. at 850, 751 P.2d 854.
[58] Wojcik, 50 Wash.App. at 851-53, 857, 751 P.2d 854.
[59] Miller, 109 Wash.App. at 147, 34 P.3d 835.
[60] Miller, 109 Wash.App. at 147, 34 P.3d 835 (alteration in original) (quoting Davidson v. Mun. of Metro. Seattle, 43 Wash.App. 569, 572, 719 P.2d 569 (1986)).
[61] Miller, 109 Wash.App. at 148, 34 P.3d 835 (quoting Linkstrom v. Golden T. Farms, 883 F.2d 269, 270 (3rd Cir.1989)).
[62] Safeco Ins. Co. v. McGrath, 63 Wash.App. 170, 177, 817 P.2d 861 (1991).
[63] Davidson, 43 Wash.App. at 571-72, 719 P.2d 569.
[64] Miller, 109 Wash.App. at 148, 34 P.3d 835.
[65] Miller, 109 Wash.App. at 148, 34 P.3d 835.
[66] Miller, 109 Wash.App. at 149-50, 34 P.3d 835.
[67] Given our holding that Moore has failed to produce sufficient evidence on the proximate cause element with the portions of Neuman's declaration admitted by the trial court, we do not address the City's remaining arguments.
[68] In answers to interrogatories, Moore stated that he based his reconstruction of the accident primarily on police reports.
[69] In light of our holding that Moore's showing on proximate cause is insufficient with the admitted habit testimony, we need not address the City's remaining arguments.