# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

ANITA ASPHY and TONY ASPHY,

Respondents,

v.

STATE OF WASHINGTON,

Petitioner.

No. 85200-1-I

DIVISION ONE

PUBLISHED OPINION

BIRK, J. — Relying on H.B.H. v. State, 192 Wn.2d 154, 429 P.3d 484 (2018), siblings Anita and Tony Asphy[1] filed negligence claims against the State for abuse they suffered during an out of home placement in the 1960s when they were children. The State moved for summary judgment, arguing much of the Asphys' evidence was inadmissible, it owed no duty to the Asphys, and the Asphys could not satisfy the foreseeability element of their claims. The superior court denied the State's motion, but granted its alternative motion for certification under RAP 2.3(b)(4). A commissioner of this court granted the State's motion for discretionary review. We hold the Asphys' evidence is admissible, supports the existence of a

---

[1] In cases involving similar allegations we commonly identify the plaintiffs by their initials. E.g., R.K. v. U. S. Bowling Cong., 27 Wn. App. 2d 187, 192, 531 P.3d 901 (2023); R.N. v. Kiwanis Int'l, 19 Wn. App. 2d 389, 404, 496 P.3d 748 (2021), review denied, 199 Wn.2d 1002, 504 P.3d 825 (2022). The Asphys have not self-identified by initials in their original pleadings or in their filings. We follow their convention. Additionally, for clarity, we use first names to refer to Anita Asphy, Tony Asphy, and their relatives. We intend no disrespect.

duty under H.B.H., and meets the foreseeability element. We affirm the denial of summary judgment and remand for further proceedings.

I

Anita filed a complaint against the State for damages arising out of physical, sexual, and mental abuse that occurred during a foster care placement by the State in the mid to late 1960s. Tony filed a complaint against the State, advancing similar claims and relying on similar allegations of abuse. The superior court consolidated the siblings' cases.

At her deposition, Anita testified that she lived in a foster home with Tony when she was five or six years old. Anita estimated she had been in the foster home for up to a year. Anita never learned from her mother why she was in foster care and could remember only a few details about her foster parents. She recalled a white woman visiting her while she was in the foster home who she believed was a social worker. Anita recalled crying for her mom, telling the woman who visited that she did not want to be there, and feeling intimidated by her foster parents not to say anything about the abuse. Several other children resided in the foster home. Anita could not recall the names of anyone present in the foster home or the woman she believed was a social worker. Her foster father groped and molested her. The foster father took other children out of the shared bedroom at night and when he brought them back, they would be crying. Anita reported this abuse to her mother after they reunited. This led to a hearing at the "welfare office" where Anita's mother, the foster parents, the woman she believed was a social worker,

2

and an attorney for the State were present. The allegations of abuse were not believed at the hearing.

At his deposition, Tony testified that while he did not directly see Anita's abuse and never spoke about it with her, he remembered rarely seeing Anita during the day and she would come back crying. Tony could not remember at what age he was placed in foster care, except that it was before he started any school. Tony could remember only that his foster parents were white. Tony described sexual abuse he suffered from his foster father. Before this deposition, Tony never disclosed this abuse to anyone.

The State moved for summary judgment. The State filed a declaration by Carrie Allen, a litigation management program manager, who stated she searched the State's records and did not find any records related to Anita or Tony as minors. The State argued there was no evidence the Asphys were in the care, custody, or control of the State, and no evidence their abuse was "foreseeable." Accordingly, the State argued it owed no duty to the Asphys.

The Asphys opposed the motion, arguing their claims are actionable under H.B.H. Anita and Tony filed declarations in support of their opposition. In her declaration, Anita stated that several other children in the foster home were not the naturally born children of her foster parents and none identified themselves as such. "The other child[ren] would often cry, express feelings and emotions of abandonment, and longings to be returned to their naturally born homes." After Anita and Tony were returned to their mother and Anita disclosed the abuse, their mother "always used the phrase 'foster care' when the subject came up," as did

Anita herself. During the child welfare office hearing, "[t]here were discussions among the people involved referencing the foster parents as being just that – *foster parents.*" The government attorney who allegedly asked questions at the hearing "used the phrase 'foster care' with the obvious knowledge and presumption that the abuse happened while I was in 'foster care.' " In his declaration, Tony stated that to the best of his knowledge, none of the other children in the foster home were naturally born to the foster parents. He stated, "A professionally dressed white woman that I understood was our social worker would routinely conduct visits at the foster home." After being returned to his mother's care and whenever the subject of that separation came up, "we always referred to our experiences in that timeframe as having occurred in foster care."

The Asphys also filed a declaration from their expert witness, Maryanne Ruiz, a former State social worker. Ruiz stated foster children are typically reluctant to express discomfort and abuse in the presence of the actual abusers because of fear of retaliation. According to Ruiz, a properly trained social worker should always privately engage a child to inquire about their health and safety under the circumstances described by the Asphys. Ruiz noted the Department of Children, Youth & Families' current policy mandates such actions from a social worker, but "[r]egardless of if the same policy was in writing at the time" when the Asphys were children, Ruiz opined, "the expectation of a private meeting has always been the same."

The superior court denied the State's motion, ruling "plaintiffs have established a genuine issue of material fact as to whether they were in a State

4

sanctioned foster home when they were children." The State moved for reconsideration. In support of reconsideration, the State filed a declaration from Maureen Walum, who began working as a social worker for the State in 1969. Walum stated the placement of a child in foster care could then be done in two ways: (1) a court order during dependency proceedings, or (2) a voluntary placement agreement. In the 1960s, "children could be placed into foster homes by the State, by religious organizations like Catholic Community Services, and by other nonprofit organizations." The State argued for the first time that statutory changes between the Asphys' placement and later law distinguished H.B.H. The State alternately sought RAP 2.3(b)(4) certification.

Anita and Tony submitted additional evidence in response. In a new declaration, Anita testified she recalled being taken to a State child welfare office on the way to the foster placement. Tyrone Asphy, Anita's and Tony's brother, signed a declaration stating that around 1969, he was removed by the State and placed in foster care because their mother was incarcerated and the Asphys needed someone to care for them. Tyrone stated he was involuntarily separated from his siblings, not given a choice about where he was placed, and "[t]he agency was not Catholic Community Service[s]." The Asphys submitted a declaration by Ossie Asphy, their aunt, who attested that she was caring for the children in or around 1969 when her sister was taken, and the children were removed from her care against her will "by White people I did not know even though I would have preferred to care for them while my sister was gone." The Asphys' expert testified

5

in a new declaration based on the above evidence that it is her opinion that the Asphys were placed in a state regulated foster home.

In its reply in support of reconsideration, the State submitted nearly a hundred pages of photocopies of past Washington statutory law and other materials dating from 1951 to 1971. The State submitted the declaration of Nancy Zahn from another case, in which Zahn described aspects of Washington's child welfare system in the 1960s and 1970s from her experience as a State social worker at that time. Quoting former RCW 13.04.040 (1951), the State argued a statutory monitoring requirement was not enacted until 1979, and, further "[a]s of 1951, the Department had a duty to 'inspect and supervise' foster homes and to enforce all licensing rules."

The court denied the State's motion for reconsideration. But it granted the State's alternative motion for RAP 2.3(b)(4) certification. The State filed a motion for discretionary review in this court, and a commissioner of this court granted the State's motion.

II

The State argues that much of the Asphys' evidence is inadmissible. When evidence is submitted in opposition to summary judgment it must be admissible. SentinelC3, Inc. v. Hunt, 181 Wn.2d 127, 141, 331 P.3d 40 (2014). We review de novo all trial court rulings in summary judgment proceedings, including regarding the admissibility of evidence. See Folsom v. Burger King, 135 Wn.2d 658, 663, 958 P.2d 301 (1998). We reject the State's objections to the Asphys' evidence.

6

A

The State challenges as inadmissible hearsay Anita's declaration testimony that their mother referred to the placement as the siblings being in a "foster home" and Tony's statement, after stating he and his sister were returned to their mother's care, that "we always referred to our experiences in that timeframe as having occurred in foster care." There being no dispute the Asphys' mother is unavailable as a witness because she is deceased, the Asphys rely on the ER 804(b)(4) hearsay exception for statements of "personal or family history."[2] "One of the oldest exceptions to the hearsay rule," Carfa v. Albright, 39 Wn.2d 697, 700, 237 P.2d 795 (1951), this exception allows a statement concerning certain matters of personal or family history of another person "if the declarant was related to the other by blood, adoption, or marriage or was so intimately associated with the other's family as to be likely to have accurate information concerning the matter declared." ER 804(b)(4)(ii). Thus, a statement by the Asphys' mother about their personal or family history is admissible if it concerns one of the subjects of personal or family history allowed under the rule.

---

[2] The State argues the Asphys did not preserve this argument because they did not rely on ER 804(b)(4) in the trial court. Where the trial court had no opportunity to address the issue, this court may decline to consider it. Sorrel v. Eagle Healthcare, Inc., 110 Wn. App. 290, 299, 38 P.3d 1024 (2002) (citing RAP 2.5(a)). However, the State raised its objection only in its reply to summary judgment, so the Asphys did not have a further brief at that time, and at the hearing the Asphys' counsel argued that their statements were admissible. The Asphys' counsel characterized the evidence as going to their mother's belief, and to that extent not offered for the truth of the matter asserted, without citing the hearsay exception. In substance, however, counsel was arguing there is reliability in such statements within families, which, as discussed below, is the foundation of the hearsay exception. The Asphys sufficiently raised the issue and we consider it on review.

These subjects are "birth, adoption, marriage, divorce, legitimacy, relationship by blood, adoption, or marriage, [or] ancestry," and, in addition to these, any "other similar fact of personal or family history." ER 804(b)(4)(i). Since foster care placement is not listed, the question is whether it qualifies as an "other similar fact" of family history. The parties have cited, and we have found, no case discussing this question.

This hearsay exception has been recognized " 'on the ground of necessity,' " because in inquiries concerning relationship or descent, " 'facts must often be proved which occurred many years before trial, and were known to but few persons,' " and strict enforcement of the hearsay rule in such cases " 'would frequently occasion a failure of justice.' " Carfa, 39 Wn.2d at 700 (quoting Fulkerson v. Holmes, 117 U.S. 389, 397, 6 S. Ct. 780, 29 L. Ed. 915 (1886)). The justification for the exception lies in the assumption that "statements of family history 'are likely to be informed by knowledge shared in common among family members on the basis of customs and understandings that are likely to be true.' " Porter v. Quarantillo, 722 F.3d 94, 98 (2d Cir. 2013) (quoting 5 CHRISTOPHER B. MUELLER & LAIRD C. KIRKPATRICK, FEDERAL EVIDENCE § 8:133, at 224 (3d ed. 2007)). Interpreting the materially identical federal rule, Porter reasoned that determining whether a fact qualifies as an "other similar fact" of family history should be informed by the common law scope of the hearsay exception. Id. At common law, a subject matter fell within the scope of the hearsay exception when it was " 'such a marked item in the ordinary family history' " and " 'so interesting to the family in common' " that statements about the subject matter in the family " 'would be likely

to be based on fairly accurate knowledge and to be sincerely uttered.' "[3] Id. at 98 (quoting 5 JOHN H. WIGMORE, EVIDENCE IN TRIALS AT COMMON LAW § 1502, at 400 (James H. Chadbourn rev. ed. 1974)).

We hold the fact of foster care placement qualifies as an "other similar fact" for purposes of the personal and family history hearsay exception. Foster care is similar to adoption, which is expressly covered by the rule, to the extent that both involve the placement of a child with caregivers in lieu of the child's parents. To "adopt" means in relevant part to "take voluntarily (a child of other parents) to be in the place of or as one's own child." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 29 (2002). Comparably, the ordinary meaning of "foster care" is "the placement of a child in a substitute home, one other than that of the child's parents." In re Dependency of D.F.-M., 157 Wn. App. 179, 188-89, 236 P.3d 961 (2010). Some limited aspects of the two kinds of placements are regulated in common. The federal Child Welfare Act, 42 U.S.C. §§ 670-679c, provides spending clause funds to states that, among other things, adopt a compliant state plan for foster care and adoption assistance. Braam v. State, 150 Wn.2d 689, 712, 81 P.3d 851 (2003). This law establishes the same requirements for both kinds of placements in regard to nondiscrimination, background checks, and maintaining

---

[3] Porter held a statement about a person's age when they moved to a different country was not such a fact. Id. at 96, 98. Courts applying similarly worded hearsay rules have held a nickname does not qualify, Commonwealth v. Collins, 598 Pa. 397, 452, 957 A.2d 237 (2008) (Pa. R. Evid. 803(19)), nor the value of an heirloom, State v. Reese, 165 Ohio App. 3d 21, 27, 844 N.E.2d 873 (2005) (Ohio Evid. R. 804(b)(4)), but a person's age and date of birth do, State v. Vandermeer, 2014 ND 46, ¶ 9, 843 N.W.2d 686 (N.D. R. Evid. 804(b)(4)), Jones v. State, 950 S.W.2d 386, 389 (Tex. App. 1997) (Tex. R. Evid. 804(b)(3)).

sibling relationships. 42 U.S.C. § 671(a)(18), (20), (31). The interstate compact on the placement of children, chapter 26.34 RCW, covers placements in foster care or placements preliminary to adoption. D.F.-M., 157 Wn. App. at 188. There are differences between foster care, long term foster care, and adoption, notably in the level of permanence. See, e.g., In re Dependency of A.C., 123 Wn. App. 244, 253, 98 P.3d 89 (2004) ("[W]hile guardianship 'is less legally secure than adoption, [it] is more permanent than foster care. " (second alteration in original)); In re Dependency of Ramquist, 52 Wn. App. 854, 862, 765 P.2d 30 (1988) (discussing long-term foster care in relation to termination of parental rights). But notwithstanding those differences, foster care is broadly "similar" to adoption as a placement with alternate caregivers, bringing it within the rule.

Further, a child's placement in foster care is the kind of marked event in the life of a family likely to be described accurately and sincerely. The family members' statements about such an event are likely to be informed by the family's shared knowledge and true, satisfying the rationale described in Porter. Given the similarity of foster care to adoption and the likely reliability of the declarant's statements, the Asphys' mother's identification of the placement as foster care is admissible under ER 804(b)(4)(ii).[4]

---

[4] The State cites an unpublished decision refusing to apply the exception to evidence a child had moved to a new residence. But placement in foster care is more than merely a move to a new residence. And we recognize that, unlike adoption, foster care is a step removed from the kinds of relationships typically engendering lawsuits involving a need to prove descent, and thus inheritance. See Pitzer v. Union Bank of Cal., 141 Wn.2d 539, 544-45, 9 P.3d 805 (2000) (evidence offered to show paternity in support of claim to inherit); Carfa, 39 Wn.2d at 699-700, 702 (same). But proof of a child's having been in foster care might matter even in inheritance cases, and in any event the rule is not limited to only certain

The hearsay exception has a limit. In this case, the purpose of the hearsay exception and thus the allowable evidence is limited to the fact of the placement being identified as foster care, and does not extend to statements of the Asphys' mother's intent or rationale not amenable to the same circumstantial support for likely reliability as the statement of what the placement was. Cf. Carfa, 39 Wn.2d at 702 (hearsay statements not admissible to prove the probable making of a will, but only to prove the fact of paternity). This answers the State's final argument, that the identification of foster care here is not " 'free enough from the risk of inaccuracy and untrustworthiness' such that 'the test of cross-examination would be of marginal utility.' " Porter, 722 F.3d at 98 (internal quotation marks omitted) (quoting Idaho v. Wright, 497 U.S. 805, 819-20, 110 S. Ct. 3139, 111 L. Ed. 2d 638 (1990)). The State argues the Asphys' placement could have occurred through a scenario not involving the State. But this argument concerns only the inferences to be drawn from this and other evidence that the Asphys were in an involuntary placement. The Asphys' mother's identification of the placement as foster care falls within the intended scope of the hearsay exception.

B

The State also challenges Anita's declaration statement that "[a]t the [child welfare office] hearing, the foster parents were present, and everyone involved in the process referred to me being placed in foster care." As to the fact of foster care, these statements are admissible under ER 803(a)(19) allowing a statement

---

kinds of cases and demands only similarity, thus envisioning case-by-case determinations relying on the purpose of the rule.

of "[r]eputation . . . in the community, concerning a person's birth, adoption, marriage, divorce, death, legitimacy, relationship by blood, adoption, or marriage, ancestry, or other similar fact of a person's personal or family history."  This exception again mirrors the federal rule and again extends to certain matters "difficult to prove through personal knowledge."  Blackburn v. United Parcel Serv., Inc., 179 F.3d 81, 98 (3d Cir. 1999).

The principle supporting such evidence is that the " 'general reputation about facts of interest to the community is probably trustworthy.' "  Id. at 99-100 (quoting 3 STEPHEN A. SALTZBURG ET AL., FEDERAL RULES OF EVIDENCE MANUAL 1699 (7th ed. 1998)).  The proponent of evidence under ER 803(a)(19) must "establish that the reputation testimony arises from sufficient inquiry and discussion among persons with personal knowledge of the matter to constitute a trustworthy 'reputation.' "  Blackburn, 179 F.3d at 99-100.  In the context of reputation among family members, the rule is met when "it is natural and likely, from their domestic habits and connections, that they are speaking the truth, and that they could not be mistaken."  Young Ah Chor v. Dulles, 270 F.2d 338, 344 (9th Cir. 1959).  Statements are sufficiently trustworthy " 'when the topic is such that the facts are likely to have been inquired about and that persons having personal knowledge have disclosed facts which have thus been discussed in the community.' "  Porter, 722 F.3d at 99 (quoting Fed. R. Evid. 803(19)-(21) advisory committee's note).  Thus, the witness "must demonstrate that he or she . . . is truly familiar with the 'community' in which the reputation has been formed, and that the basis of the reputation is one that is likely to be reliable."  Blackburn, 179 F.3d at

101. Rumors of unknown origin or a single instance of a person saying so are insufficient to demonstrate reliability. Id.

Anita's testimony that the participants in the hearing she attended used the term "foster care" to describe her placement meets these requirements. Her testimony supports the inferences that the hearing participants would have had personal knowledge of the circumstances under consideration, would not have been mistaken, would have made inquiry, and would have reliably known the placement to have been foster care. Indeed, the State argues that the occurrence of the hearing by itself does not establish state placement because, it argues, "after April 1969" the governing statutes "did not limit the [State's] requirement to investigate and provide child welfare services to only foster children, but rather to provide those services to any child who was the subject of a report of abuse." This suggests the hearing participants would appreciate the nature of the placement. Anita's testimony supports the existence of a community knowledgeable of the subject matter such that the hearing participants' identification of the placement as foster care is admissible under ER 803(a)(19).

C

The balance[5] of the State's challenges to the Asphys' evidence criticizes certain statements as being conclusory, speculative, and lacking personal

---

[5] Both in the trial court and in this court the State asserted the so-called "sham affidavit" rule. Under this rule, " '[w]hen a party has given clear answers to unambiguous [deposition] questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony.' " Taylor v. Bell, 185 Wn. App. 270, 294, 340 P.3d 951 (2014) (last alteration in original) (internal quotation marks omitted) (quoting Cornish Coll. of

13

knowledge. These are (1) Anita's identification of the visitor at their placement as a social worker, (2) Anita's and Tyrone's statements, in response to the State's summary judgment motion, that they had not been placed in care by Catholic Community Services, and (3) Ruiz's expert opinion that the circumstances described by the Asphys point to placement decisions made only by the State (impliedly, as opposed to religious and other service providers).

As to the Asphys' statements, the State relies on the principle stated in SentinelC3 that, to defeat a motion for summary judgment, a party must present more than ultimate facts or conclusory statements, and that a party's bare "beliefs"

the Arts v. 1000 Virginia Ltd. P'ship, 158 Wn. App. 203, 227, 242 P.3d 1 (2010)). The State's arguments under this rule have been a moving target. In the trial court, the State appeared to argue that the Asphys contradicted themselves by stating in their declarations they believed the visitor at their placement was a social worker, whereas in their depositions they had disclaimed knowledge of her identity and merely described her behavior (which was consistent with the actions of a social worker visiting a placement). The State also argued that Anita contradicted herself by testifying in her deposition that she did not discuss with her mother the reason they were removed from her care, but then testifying in her declaration to statements her mother made (in context referring to her mother's identifying the removal as foster care). On review, the State does not advance either of these arguments, but for the first time argues that Anita contradicted herself by testifying in her deposition that she did not remember meeting with anyone before going to the foster home, but testifying in a declaration that she was taken to a state welfare office on the way to the placement. As a result of the State's shifting arguments, we are not required to reach any of these contentions, because the State did not address in its brief the alleged contradictions it asserted in the trial court, see Wilkinson v. Chiwawa Comtys. Ass'n, 180 Wn.2d 241, 245 n.1, 327 P.3d 614 (2014) (appellate court will decide a case based on the issues raised by the parties in their briefs), and it did not object in the trial court to the contradiction it asserts here, see Jacob's Meadow Owners Ass'n v. Plateau 44 II, LLC, 139 Wn. App. 743, 755-56, 162 P.3d 1153 (2007) (party must object if it believes summary judgment record contains inadmissible evidence). We have carefully reviewed the Asphys' deposition testimony and subsequent declaration testimony. Their testimony is generally entirely consistent and forthrightly stated, and nothing comes close to the sort of direct, unexplainable contradiction falling within the narrow "sham affidavit" rule.

do not meet this standard when they are "not based on any actual evidence." 181 Wn.2d at 140. This does not fairly describe the Asphys' proffer that the visitor during their placement was a social worker and that to their knowledge Catholic Community Services did not place them. The inference the visitor was a social worker is not lacking in "actual evidence," but is rationally based on the Asphys' observations of their own circumstances and the behavior of the visitor towards them. Likewise, the evidence that Anita, Tony, Tyrone, and Ossie all lack any knowledge that Catholic Community Services was involved in placing the siblings is some evidence supporting the inference that it was not—because a trier of fact could infer that if it had been involved, one of them would likely recall that fact.[6]

These inferences are appropriate ones to be drawn because the " 'fact or proposition sought to be established' " may be " 'deduced as a *logical consequence*' " from the witnesses' observations within their personal knowledge and other available information. See Fairbanks v. J.B. McLoughlin Co., 131 Wn.2d 96, 101, 929 P.2d 433 (1997) (quoting Dickinson v. Edwards, 105 Wn.2d 457, 461, 716 P.2d 814 (1986)). At summary judgment, we are required to consider these

---

[6] The Asphys' evidence of specific factual circumstances within their own knowledge supporting the inference they were in involuntary foster placement distinguishes SentinelC3. In SentinelC3, dissenting shareholders opposed summary judgment on the valuation of their shares in a closely held corporation based on an unsworn, unauthenticated hearsay expert report and on one of the shareholder's assertions that company insiders had " 'concocted a plan' " to force the dissenters out of the company and had "reached a 'secret agreement' " to dilute the value of their shareholdings. 181 Wn.2d at 136. But the shareholder relied literally on only those bald assertions, identifying no factual circumstances based on knowledge, investigation, expertise, or inference pointing to why a trier of fact could conclude that insiders had in fact " 'concocted a plan' " or made a " 'secret agreement.' " Id.

15

reasonable inferences in the light most favorable to the Asphys. Wolf v. State, 2 Wn.3d 93, 102, 534 P.3d 822 (2023). This does not imply witnesses may testify at trial other than based on personal knowledge, ER 602, or outside the confines of the lay opinion rule, ER 701. "In the usual circumstances, a lay witness should only relate observations to the jury and let jurors form their own opinions and conclusions. This is because a lay witness is in no better position to arrive at an opinion or conclusion from the facts known to a witness." Ashley v. Hall, 138 Wn.2d 151, 156, 158, 978 P.2d 1055 (1999) (error to allow lay opinion that automobile collision was unavoidable). But even if we concluded some of the challenged statements by the Asphys were inferences beyond their knowledge—such as the inference that the visitor was a social worker—we would be required to draw those inferences in the Asphys' favor here because they are supported by the balance of their observational testimony. For purposes of summary judgment, to the extent the trial court considered any parts of the Asphys' declarations going beyond the personal knowledge to which they may testify at trial but nevertheless within the reasonable inferences otherwise supported, any error was harmless.

Finally, Ruiz's opinions are admissible. This court will not disturb a trial court's ruling on the admissibility of expert testimony at summary judgment " '[i]f the reasons for admitting or excluding the opinion evidence are both fairly debatable.' " Moore v. Hagge, 158 Wn. App. 137, 155, 241 P.3d 787 (2010) (alteration in original) (quoting Miller v. Likins, 109 Wn. App. 140, 147, 34 P.3d 835 (2001)). ER 702 permits testimony by a qualified expert where "scientific, technical, or other specialized knowledge will assist the trier of fact to understand

the evidence or to determine a fact in issue." Courts generally interpret possible helpfulness to the trier of fact broadly and will favor admissibility in doubtful cases. Moore, 158 Wn. App. at 155. Conclusory or speculative expert opinions lacking an adequate foundation will not be admitted. Id. If there is concern that expert testimony is " 'somewhat speculative,' " the court should consider any danger that the jury may be overly impressed with a witness possessing the " 'aura of an expert.' " Id. (quoting Davidson v. Mun. of Metro. Seattle, 43 Wn. App. 569, 571-72, 719 P.2d 569 (1986)). However, the focus of this concern is on the adequacy of the expert's foundation, not the expert's conclusions. Desranleau v. Hyland's, Inc., 26 Wn. App. 2d 418, 438, 527 P.3d 1160, review denied, 1 Wn.3d 1030, 534 P.3d 798 (2023) (citing Volk v. DeMeerleer, 187 Wn.2d 241, 277, 386 P.3d 254 (2016)). Disputes about the validity of the facts underlying an expert's opinion go to weight, rather than admissibility, and a " 'borderline' case 'should be decided in favor of admissibility, allowing the jury to decide for itself whether the opinion is reliable.' " Id. at 442 (quoting 5B KARL B. TEGLAND, WASHINGTON PRACTICE: EVIDENCE LAW & PRACTICE § 702.27, at 117 (6th ed. 2016)).

Ruiz provided the opinion, among others, that the type of placement consistent with the Asphys' description was made only by the State. Ruiz based this opinion on Anita and Tyrone describing their removal from their mother's care during her incarceration, trips to the state welfare office, the hearing after their placement, the family's understanding that the placement was foster care, the placement of siblings in separate foster homes, and their denial of knowledge that another agency such as Catholic Community Services was involved. The Asphys'

testimony to these facts is admissible, but even if it were not, an expert may rely on facts or data that are inadmissible in forming the expert's opinions, though there are limitations on the expert's ability to relay inadmissible information at trial. ER 705; see In re Dependency of R.D., 27 Wn. App. 2d 219, 229, 532 P.3d 201 (2023) (chemical dependency evaluation was not admissible, but expert social worker could rely on evaluation in explaining her opinions). The State disputes the accuracy of the facts on which Ruiz based her opinions, but this goes to weight, not admissibility. The foundation for Ruiz's opinion was adequate.

III

Turning to the superior court's denial of summary judgment, we begin by determining the questions appropriately before us. The superior court granted certification on "the legal standard for establishing negligence" where "there may be an inference but no direct evidence of dependency," as well as on the issue of foreseeability. Exercising our discretion to frame the scope of discretionary review, see State v. LG Elecs., Inc., 185 Wn. App. 123, 130 n.12, 340 P.3d 915 (2014), aff'd, 186 Wn.2d 1, 375 P.3d 636 (2016), we consider the following questions properly before us: (1) Did the Asphys present sufficient evidence to support a duty of care by the State where there was no direct evidence of dependency, and (2) Did the Asphys' evidence meet the foreseeability requirement? We conclude the Asphys' evidence is sufficient to support a duty of care under H.B.H. and meets the foreseeability requirement.

A

The State first argues it is entitled to summary judgment because the Asphys cannot establish that it owed them a duty.

The State focuses on H.B.H.'s statement that "the establishment of a dependency imposes essential rights and duties on the State to care for dependent children." 192 Wn.2d at 168. Having stated this, H.B.H. identified several statutory duties in effect at the time of its analysis and explained, the State "becomes the legal custodian of the dependent child, and the State alone controls the services provided to the child and determines where the child will reside." Id. Based on these statements in H.B.H., the State argues the Asphys' claims fail because they did not present evidence that they were "adjudicated dependents," emphasizing the lack of "any court records" showing that a court intervened in their family. And even if there were evidence that they were "adjudicated" dependent, the State argues further, it was the "statutory backdrop" in effect at the time of its decision that guided the Supreme Court's analysis in H.B.H. Pointing to different statutory provisions in effect in the 1960s, the State argues the Asphys cannot show that "the State, as opposed to some other entity . . . , was entrusted with their welfare and responsible for supervising their placement." We disagree.

The State's focus on the statutory provisions in effect at the time of H.B.H. is too narrow. The Supreme Court's discussion began with the State's "compelling parens patriae interest in protecting the physical, mental, and emotional health of children in this state." H.B.H., 192 Wn.2d at 163 (citing In re Dependency of Schermer, 161 Wn.2d 927, 941, 169 P.3d 452 (2007)). When the State "exercises

19

its parens patriae right" to place children in foster care, the State has not merely a "statutory" but a "constitutional" duty to ensure those children are free from unreasonable risk of harm. Id. at 164 (citing Braam, 150 Wn.2d 699). As early as 1905, the Washington Supreme Court recognized, " 'It is the unquestioned right and imperative duty of every enlightened government, in its character of parens patriae, to protect and provide for the comfort and well-being of such of its citizens as, by reason of infancy . . . are unable to take care of themselves.' " Russner v. McMillan, 37 Wash. 416, 419, 79 P. 988 (1905) (quoting County of McLean v. Humphreys, 104 Ill. 378, 383 (1882)). While the statutory provisions in effect at any given time inform the nature of the State's relationship with dependent children,[7] H.B.H. is clear that it was addressing not merely the particular statutory framework in effect when it was decided but more generally the State's "exercise[]" of its enduring parens patriae right and responsibility. 192 Wn.2d at 164. Underscoring this, H.B.H. described the nature of the State's relationship with dependent children by examining the current statutory framework in 2018, id. at 163-68, without ever indicating its analysis depended on the statutory provisions in effect at the time of the placements at issue, the first of which was 20 years earlier in 1998, id. at 159.

H.B.H. concluded, as a matter of tort law, that "entrustment and vulnerability" are "at the heart" of the special protective relationship. Id. at 172. Rejecting the State's contention there that physical custody was the key to

---

[7] And statutory provisions may support a duty of care in certain circumstances. Tyner v. Dep't of Soc. & Health Servs., 141 Wn.2d 68, 82, 1 P.3d 1148 (2000) (citing RCW 26.44.050).

triggering the duty, the court said "special protective relationships 'are based on the liable party's assumption of responsibility for the safety of another.' " Id. at 173 (quoting Niece v. Elmview Grp. Home, 131 Wn.2d 39, 46, 929 P.2d 420 (1997)). The foundation of a special protective relationship, and thus the duty of care, is "entrustment for the protection of a vulnerable victim." Id. Such a relationship exists when "children are involuntarily removed from their homes by an affirmative act of the State" and are confined to "a state *system* of foster care." Id. at 174 (emphasis added) (citing DeShaney v. Winnebago County Dep't of Soc. Servs., 489 U.S. 189, 201 n.9, 109 S. Ct. 998, 103 L. Ed. 2d 249 (1989)). The court likewise cited other authority holding that "involuntary foster care placement constitutes state custody." Id.

Direct evidence of a dependency adjudication is not required. The Asphys' evidence supports the inference that the State placed them in involuntary foster care. There is direct evidence that Anita's and Tony's placements were involuntary and direct evidence that the reason for the placements was their mother's incarceration. They provide evidence that the children had been in the care of their aunt but were removed from her home. They provide Ruiz's expert opinion that this kind of placement—an involuntary one separating siblings—was one only the State could make even in the 1960s. This evidence supports the inference that the State removed them and placed them in the state "system" of foster care then in effect.

The State argues that actors other than the State's employees, at the time a county probation officer, "could place a child into emergency protective custody,"

and "[i]n 1969, children could arrive in foster care in different ways, including through a voluntary placement agreement, where the parent retained legal custody of the child, and the child is not adjudicated dependent." While adverting to the possibility of a voluntary placement, the State is conspicuously cautious never to argue that anyone other than the State could involuntarily remove children from their parents in the 1960s. The State's argument improperly ignores Anita's and Tony's testimony supporting their allegation that they were involuntarily placed in foster care, and instead demands the speculation that their mother might have made a voluntary placement that they as children might have perceived as an involuntary one. Besides improperly arguing inferences in favor of the party seeking summary judgment, this argument overlooks Ossie's testimony that the children were taken involuntarily. The evidence the State cites in support of its argument, moreover, the declaration of former state social worker Walum, indicates that foster care placement "can be done in two ways"—either by a court or by a voluntary placement. This only confirms that if the Asphys' placement was an involuntary one, as Anita's, Tony's, and Tyrone's testimony supports inferentially and as Ossie's testimony supports directly, then a trier of fact could infer the placement was by court order.[8]

---

[8] Because the Asphys' evidence supports the inference that the State placed them into the then existing foster care system, M.E. v. City of Tacoma, 15 Wn. App. 2d 21, 37, 471 P.3d 950 (2020), review denied, 196 Wn.2d 1035, 478 P.3d 90 (2021), is distinguishable. That case stated, "In fact, H.B.H. does not even establish a special relationship between [the State] and children who are not in the legal custody of [the State]." Id. at 37. The court said this in holding that a special relationship did not arise when municipal law enforcement officers merely investigated discrete reports of possible abuse of children who were not dependent. Id. at 37-38.

In an effort to distinguish H.B.H., the State argues that even if the Asphys' evidence supports the inference that the State took them into custody, a special relationship under H.B.H. still would not arise without "concurrent evidence that they were in State-run foster care." The State attempts to distinguish the statutory scheme in effect in the 1960s from that discussed in H.B.H., in hopes of showing that children taken into involuntary foster care in the 1960s were not "so entrusted" to the State that it owed a duty of care.

The State first points to the fact that in the 1960s, county probation officers initiated dependency proceedings, local law enforcement investigated reports of abuse (until a state agency obtained that authority under former RCW 26.44.050 (LAWS OF 1969, 1st Ex. Sess., ch. 35, § 5)), and county prosecutor offices had the burden of proof at dependency fact finding hearings. See former RCW 13.04.040 (1959); former RCW 26.44.050 (1965); former JuCR 4.4(f) (1969). The State also asserts that in the 1960s, beyond the State itself, county probation officers, religious organizations and other nonprofit organizations "facilitated placing children." It relies on the testimony of former state social worker Zahn, that, "for those homes certified by a child placing agency, the child placing agency was in charge of any home visits or periodic visits, as well as maintaining the certification of the home." Additionally, the State relies on the role that child placing entities had in licensing foster homes. Former RCW 74.15.040 (1967) (Licenses for foster homes under the supervision of a licensed agency were issued upon certification by the licensed agency to the department that the homes meet the requirements for foster homes.).

But these procedural circumstances do not speak to the legal relationship and resulting responsibility on which H.B.H. focused. The State nowhere argues that any of the other parties it says were involved in foster placements in the 1960s had legal custody of involuntarily placed foster children. H.B.H. specifically rejected that "day-to-day physical custody" was the trigger for the duty of care as opposed to the State's responsibility as "legal custodian," even where the State relied on other parties to discharge its responsibilities. 192 Wn.2d at 175. Moreover, the statutory provisions on which the State relies placed legal custody then, as now, with the State itself. The State emphasizes former RCW 13.04.010 (1959), repealed by LAWS OF 1977, 1st Ex. Sess., ch. 291, §§ 81(1), 83 (effective July 1, 1978), under which dependent children were "subject to the custody, care, guardianship and control of the court." But the same statute premised the court's role in placing children (similar to its role in dependency today, see RCW 13.34.130(1)) on the fact that dependent children "shall be considered wards of this state," former RCW 13.04.010.

Our conclusion is supported by G.M. v. Olympia Kiwanis Boys Ranch, No. 57814-0-II, (Wash. Ct. App. Apr. 9, 2024), slip op. at 4, https://www.courts.wa.gov/opinions/pdf/D2%2057814-0-II%20Published%20Order.pdf. There, the plaintiff entered foster care shortly after being born and resided at several placements including foster homes, group homes, and crisis resource centers during his childhood. Id. He recalled being sexually abused in at least three of those placements but did not remember the exact dates of these childhood events. Id. In adulthood, the plaintiff sued the Olympia Kiwanis Boys Ranch (OKBR), Kiwanis

24

Club of Olympia, and Kiwanis International for the abuse. Id. At his deposition, the plaintiff testified about the details of the abuse he remembered, but could not recall the specific dates he resided at OKBR. Id. at 5. The State claimed the plaintiff was never placed at OKBR. Id. And three letters discussed only OKBR's plans to accept the plaintiff as a resident. Id. at 6. The Kiwanis defendants argued there was no evidence the plaintiff was placed at OKBR, id. at 5-6, and the superior court granted summary judgment, id. at 8. We reversed. Id. at 12. We explained "reasonable minds could conclude that [the plaintiff] resided at OKBR based on his testimony and the written records provided to the court." Id. at 10. This was a material fact relevant to whether OKBR owed him a duty of care, and "summary judgment was inappropriate in light of the conflicting evidence about this fact." Id.

When the evidence at summary judgment is susceptible to competing reasonable inferences, some supporting liability and others not, a fact question is presented that a jury must determine. Litvack v. Univ. of Wash., __ Wn. App. 2d __, 546 P.3d 1068, 1084 (2024) ("Taken together and viewed in the light most favorable to Dr. Litvack, the evidence supports reasonable inferences of both discriminatory and nondiscriminatory motivations meaning a jury must determine the true motivation."); Southside Tabernacle v. Pentecostal Church of God, Pac. Nw. Dist., Inc., 32 Wn. App. 814, 821, 650 P.2d 231 (1982) ("even if the basic facts are not in dispute, if the facts are subject to reasonable conflicting inferences, summary judgment is improper."). For purposes of summary judgment, it is irrelevant whether the fact question arises from direct or circumstantial evidence. This is because Article I, section 21 of the Washington constitution guarantees

25

litigants the right to have a jury determine questions of disputed material facts. Haley v. Amazon.com Servs., LLC, 25 Wn. App. 2d 207, 218, 522 P.3d 80 (2022). The Asphys' evidence supports the inference that the State removed them and placed them in foster care, which, if found by a trier of fact, supports that the State and they were in a special protective relationship requiring the State to use reasonable care to protect them from foreseeable harms at the hands of foster parents. H.B.H., 192 Wn.2d at 178.

B

The Asphys' evidence also satisfies the foreseeability requirement. The State argues that it asks the court to review the foreseeability requirement "as it applies to whether a duty is owed," which is a question of law. See McKown v. Simon Prop. Grp., Inc., 182 Wn.2d 752, 764, 344 P.3d 661 (2015) ("foreseeability plays a role in both the legal and factual inquiries regarding duty and its scope"). However, the State in fact argues the factual aspect of foreseeability in arguing that the scope of the duty recognized in H.B.H. is "limited" to "foreseeable harms." When the question is "whether the harm is within the scope of the duty owed," it is "a question of fact for the jury." McKown, 182 Wn.2d at 764. The State argues, factually, that the Asphys point to no evidence of "what the State knew or did not know with respect to the foster parents," or that that there was reason to believe other than that the foster parents had "a sterling reputation."

"Reasonable foreseeability does not require that the precise manner or sequence of events in which a plaintiff is harmed be foreseeable." Albertson v. State, 191 Wn. App. 284, 297, 361 P.3d 808 (2015). The foreseeability

requirement asks "if a reasonable person in the defendant's position would be aware of a 'general field of danger' posing a risk to one such as the plaintiff." H.B.H., 192 Wn.2d at 176-77 (quoting Niece, 131 Wn.2d at 50). This requires only that "[t]he hazard that brought about or assisted in bringing about the result must be among the hazards to be perceived reasonably, and with respect to which defendant's conduct was negligent." Rikstad v. Holmberg, 76 Wn.2d 265, 268, 456 P.2d 355 (1969). Once a duty of care makes a defendant responsible to protect a plaintiff from "all foreseeable harms," the issue becomes whether a harm may be said to be "legally unforeseeable," such as, in cases of intentional or criminal conduct by a third party, because "it is 'so highly extraordinary or improbable as to be wholly beyond the range of expectability.' " Niece, 131 Wn.2d at 50 (quoting Johnson v. State, 77 Wn. App. 934, 942, 894 P.2d 1366 (1995)).

The abuse endured by the Asphys is within the general field of danger reasonably perceived in placing children in foster homes, and was not so highly extraordinary or improbable as to be unforeseeable as a matter of law. While the State argues it was not primarily responsible for licensing foster homes in the 1960s, even then the statutory "minimum requirements" for an "agency," which included a "foster-family home," addressed "[t]he character, suitability and competence" of an agency and other persons "directly responsible for the care and treatment of children." Former RCW 74.15.020(3) (1967); former RCW 74.15.030(2)(b) (1967). The fact the Asphys' evidence raises sufficient inferences of State placement to survive summary judgment does not, as the State argues, impose "strict liability." For the Asphys to prevail at trial, a trier of fact must draw

27

the necessary inferences of State placement in the Asphys' favor, and the Asphys must prove breach of the standard of care and proximate causation.

We affirm the trial court's orders denying the State's motion for summary judgment and denying reconsideration, and we remand for further proceedings consistent with this opinion.[9]

_Birk, J._

WE CONCUR:

_Chung, J._          _Mann, J._

---

[9] The Asphys argue subconscious bias permeates the State's arguments, in violation of <u>Henderson v. Thompson</u>, 200 Wn.2d 417, 518 P.3d 1011 (2022), <u>cert. denied</u>, 143 S. Ct. 2412, 216 L. Ed. 2d 1276 (2023). Because of our disposition, we need not reach this issue.